The SUPERIOR OIL COMPANY, Appellant,

v.

EL PASO NATURAL GAS COMPANY, Appellee.

No. 5592.

Court of Civil Appeals of Texas.

El Paso.

March 18, 1964.

Rehearing Denied April 15, 1964.

Stubbeman, McRae, Sealy & Laughlin, W. B. Browder, Jr., Midland, H. W. Varner, Roland B. Voight, Houston, for appellant.

A. R. Grambling, Hardie, Grambling, Sims & Galatzan, El Paso, George D. Horning, Jr., Hogan & Hartson, Washington, D. C., for appellee.

CLAYTON, Justice.

This is a suit for declaratory judgment filed by appellant, Superior Oil Company (Superior) against appellee, El Paso Natural Gas Company (El Paso), seeking the construction and interpretation of two gas sales contracts entered into between the parties which involved the sale of gas in interstate commerce. The first contract (dated April 13, 1953), involved the sale by Superior and the purchase by El Paso of casinghead gas produced in certain counties within the Permian Basin area of Texas. This contract, known as the "Spraberry" contract, contains a so-called "favored nation" clause providing as follows:

> "If, at any time during the term of this agreement there shall be in effect any agreement between Buyer and any other party or parties providing for the purchase of Residue Gas by Buyer at a point located within the Permian Basin area at a price per one thousand (1,000) cubic feet higher than the price at the same time payable by Buyer to Seller for Residue Gas hereunder, Buy-

er shall forthwith notify Seller of such fact and of the amount of such higher price, and thereupon the price at the time payable to Seller for Residue Gas hereunder shall be immediately increased so that it will equal the highest price payable at the same time under any such other agreement, and such higher price hereunder shall continue in effect so long as, but only so long as, any such higher price is payable for Residue Gas by Buyer under any such other agreement. In determining whether the price payable under any such other agreement is higher than the price payable to Seller hereunder, due consideration shall be given to the provisions of this agreement as to quantity and quality of Residue Gas, delivery pressure, gathering and compressing arrangements, provisions, regarding measurement of gas, including deviation from Boyle's law, taxes payable on or in respect of the Residue Gas delivered, *and all other pertinent factors.*" (Emphasis supplied).

The Federal Power Commission, in an opinion hereinafter referred to, describes the "favored nation" clauses, such as the foregoing, in the following language:

"Typically, as here, a most-favored-nation contract clause provides that if a purchaser of gas from a certain producer pays another producer in the same area a higher rate, the first producer may raise or escalate his rate to that purchaser correspondingly. The clause is said to be activated or 'triggered' by the purchaser's paying the other producer a higher rate. But in order for 'triggering' to occur, where (as here) the contract so provides, the producer filing the most-favored-nation rate increase must show that the other producer is the type of seller contemplated and produces in the area indicated in the contract, that the gas being purchased from the other producer is comparable gas, and that the rate being paid for it is 'higher' in fact as well as in appearance."

Superior claims that El Paso had a residue gas contract with Shell Oil Company (Shell), dated May 21, 1948, with delivery within the Permian Basin area, under which, on and after October 9, 1959, El Paso was paying Shell 16 cents (plus tax reimbursement) per Mcf for gas at the same time El Paso was paying Superior only 12.712 cents (plus tax reimbursement) for such gas. Superior claimed that a controversy had arisen between the latter parties as to the meaning, effect and interpretation of the favored nation clause in the "Spraberry" contract between Superior and El Paso; that Superior maintains that El Paso was under obligation to take the gas from Superior at the higher 16-cent price, while (according to Superior) El Paso "maintains that notwithstanding said facts and particularly the contract between the parties", Superior was not entitled to the higher price or to receive any amount greater than was at that time actually being paid to Superior.

The latter claims that a further controversy existed between the parties to the suit: that under date of March 8, 1955 the parties entered into a contract whereby El Paso was to purchase from Superior gas produced from the Eumont field in Lea County, New Mexico. This contract, known as the "Eumont" contract, also contained a favored nation clause, somewhat differently worded than the clause set out above:

"Section 5. If at any time or times after the date of this agreement Buyer shall purchase from any other seller gas from dry gas or gas-distillate wells within Lea or Eddy Counties, New Mexico, or Cochran, Hockley, Yoakum, Gaines, Andrews, Ector, Winkler, Crane or Ward Counties, Texas, at a price per one thousand (1,000) cubic feet higher than the price at the time payable hereunder, the price payable to Seller for gas hereunder shall be im-

mediately increased to equal such higher price paid to such other seller, and such higher price hereunder shall continue in effect so long as, but only so long as, any such higher price is paid to such other seller. In determining whether the price payable under such other contract or agreement is 'higher' than the price payable for gas under this agreement, due consideration shall be given to the provisions of this agreement as compared with such other contract or agreement as to quantity and quality of gas, delivery pressures, gathering and compressing arrangements, provisions regarding measurement of . gas, taxes payable on or with respect to such gas, *and all other pertinent factors."* (Emphasis supplied).

Superior alleged that El Paso had a gas purchase contract with West Texas Gathering Company (West Texas) covering gas produced from dry gas and gas-distillate wells produced and delivered to El Paso within Winkler County, Texas, and that on and after May 27, 1959 El Paso was paying 18 cents per Mcf to West Texas for such gas, while at the same time El Paso was paying only 10.5 cents per Mcf for the gas well gas under its "Eumont" contract with Superior.

The further controversy arose, Superior alleges, over the validity, meaning, effect and interpretation of the latter contract between the parties, Superior claiming that El Paso is under obligation to take said gas under all provisions of said contract, while El Paso maintains that notwithstanding the facts and contract, Superior was not entitled to receive a higher price by reason of the fact that El Paso was paying West Texas 18 cents per Mcf because (1) West Texas was not a "seller" within the meaning of the language of the favored nation clause, and (2) the price of 18 cents per Mcf was not higher than the 10.5 cents then being paid to Superior by El Paso.

The prayer of Superior's petition asked that the trial court construe the contracts with El Paso and declare that the quoted provisions of said contracts are plain, unambiguous, valid, legal and binding and that the rights of the parties are fixed and governed by the express terms and provisions of the contracts as written and as they may be affected by written agreements as exist between El Paso and any other party or parties providing for the purchase of residue gas or gas from dry gas or gas-distillate wells, as the case may be. El Paso filed special exceptions to the petition, and Superior filed a motion for summary judgment. On February 27, 1962 the trial court entered a judgment denying the motion for summary judgment, sustaining El Paso's special exceptions and dismissing the suit "for the reason that this court does not have jurisdiction to entertain this suit or to enter any judgment herein except to dismiss this suit from the docket of this court." From such judgment Superior brought this appeal based upon the sole point of error that the trial court had erred in dismissing the cause of action for want of jurisdiction. El Paso brought forward in three counter-points the exceptions directed to the petition of Superior and asserted that the trial court's ruling dismissing the suit was not error because (1) primary jurisdiction over the matters involved rested with the Federal Power Commission (F.P.C.); (2) Superior had failed to exhaust its administrative remedies; and (3) Superior's petition failed to state a claim cognizable under the Declaratory Judgment Act of Texas.

There seems to be no dispute here that the two gas sales contracts of Superior involved in this cause embody the sale in interstate commerce of gas for resale, that Superior is a "natural gas company" within the meaning of that term in the Natural Gas Act and as interpreted by the United States Supreme Court in the case of Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035, and that therefore such sales are subject to the jurisdiction of and regulation by the Federal Power Commission. The primary point of conten-

tion here seems to be, from the standpoint of Superior, not whether the Commission may properly construe gas contracts such as these to determine as a matter of law the prices authorized therein, but whether state courts may construe such contracts in order to determine their meaning and declare the rights of the parties thereto; and from the standpoint of El Paso, whether the state courts have any inherent power to pass upon the matter in controversy, since the same is essentially one of determining and fixing rates to be paid under said contracts for gas sold in interstate commerce for resale—a matter exclusively within the jurisdiction of the F.P.C., subject only to review by the courts.

El Paso contends that Superior recognized the primary exclusive jurisdiction of the F.P.C. over the two contracts here in question by its action with regard to the contracts before the F.P.C. On November 29, 1954 Superior filed with the F.P.C. its "Spraberry" contract with El Paso, which, together with all supplements thereto, was embodied in Superior's F.P.C. Gas Rate Schedule No. 30. On April 4, 1955 Superior filed with the F.P.C. its "Eumont" contract with El Paso, which, together with supplements thereto, was embodied in Superior's F.P.C. Gas Rate Schedule No. 44. The two other contracts which Superior mentions in its pleadings between El Paso and Shell, and El Paso and West Texas, were also filed with the F.P.C., the Shell contract being a part of Shell's F.P.C. Gas Rate Schedule No. 20, and the West Texas contract being part of West Texas' F.P.C. Gas Rate Schedule No. 1. Under this latter contract, the price payable by El Paso to West Texas during the year 1959 was apparently 18 cents per Mcf to be adjusted to West Texas' actual cost-of-service as computed for the year 1959 after the conclusion of that year. On March 23, 1959, Shell, taking the position that the purchases by El Paso from West Texas at the rate above referred to, "triggered" the favored nation clause of Shell's contract with El Paso as embodied in Shell's F.P.C. Gas

Rate Schedule No. 20, filed with F.P.C. an increase in rates under said schedule for gas sold to El Paso from 10.80548 cents to 16.0 cents. This increase in rates was suspended by F.P.C. and thereafter was made effective, subject to refund. On May 27, 1959, Superior in turn filed with F.P.C. an increase in rates from 10.5 cents to 15.2 for gas it sold to El Paso under Superior's Schedule No. 44 (the "Eumont" contract), on the contention that the price being paid to West Texas by El Paso under the former's Schedule No. 1 triggered the favored nation clause of Superior's Schedule No. 44. This proposed increase was also suspended by F.P.C., but was subsequently also made effective, subject to refund. On October 12, 1959, Superior similarly filed with F.P.C. an increase in rates from 12.712 cents to 16.0 cents for gas it sold to El Paso under Superior's Gas Rate Schedule No. 30 (the "Spraberry" contract), this increase being also based upon the favored nation clause in the contract with El Paso under Schedule No. 30, predicated upon the price being then paid by El Paso to Shell under the latter's Rate Schedule No. 20. This proposed rate increase was similarly suspended by F.P.C. and thereafter was made effective and was collected by Superior, subject to refund by Superior upon further order of the F.P.C.

On June 26, 1961 the F.P.C. issued an "Order to Show Cause" in proceedings captioned Shell Oil Company, et al., Docket No. R161–515, and among the several Respondents in said proceedings were Shell and Superior. On July 21, 1961 the F.P.C. permitted El Paso to intervene in said proceedings under Docket No. R161–515, and El Paso actively participated therein. Various hearings under said docket number were held from time to time before the F.P.C., during the course of which hearings the present suit was filed by Superior against El Paso on August 28, 1961. On March 15, 1963, in Opinion No. 382, the Commission issued its "Memorandum Opinion and Order Rejecting Proposed Rate Increase Filings, Disallowing Proposed Increases in

Rates and Ordering Refunds". In its opinion the Commission recited that there were two principal issues involved in the proceedings:

"(1) Were the 'favored-nation' escalation clauses contained in the contracts which the 15 respondents herein executed before April 3, 1961, 'triggered' by El Paso Natural Gas Company's purchase at a 'higher price' of gas from the West Texas Gathering Company? If they were, then the 'contractual support' or consent of El Paso that must exist before the respondents' increased rates may be accepted for filing has been provided. Although El Paso paid West Texas a number of cents more per Mcf than the contracts between El Paso and the respondents herein called for, this would not constitute a 'higher price' if the latter contracts are interpreted to take account of evidence which shows that the West Texas gas was of higher quality and usefulness to El Paso than respondents' gas.

"(2) Are favored-nation or other 'artificial' escalation clauses to be construed as being triggered by a rate increase that this Commission has rejected? This issue is implicit in Superior's contention that its rate increases, with one exception, were not based on the subject West Texas purchase, but on El Paso's purchases from Hunt Oil Company and Shell at increased rates that allegedly were triggered by the subject West Texas purchase. (In fact, Shell's proposed increases were based upon other increased rates of Shell itself that were allegedly triggered by the subject west Texas sale.)"

In disposing of this second issue, the F.P.C. held:

*"Triggering of Artificial Escalation Clauses by Disapproved Rates:*

"Although the examiner found that Superior's contract clauses, like those of the other respondents, were not trig-

gered by the El Paso purchase from West Texas—a finding we approve—Superior contends that the legality of its filings is not affected by that finding, because its increases were based on increased rates that El Paso paid to Hunt and Shell. But those increases, all of which were suspended and are subject to refund, were themselves based on the West Texas sale.

"We have already found that those increases were not authorized by the contracts between El Paso, Shell, and Hunt. For that reason, we think that Superior was not entitled to collect higher rates under its contracts with El Paso.

"Superior's contracts provide that in the event El Paso agrees to purchase gas from another seller at a price higher than the price provided in Superior's contract, 'the price * * * payable to [Superior] * * * shall be immediately increased so that it will equal the price payable at the same time *under such other contract,* and such higher price shall continue in effect so long as, *but only so long as,* any such higher price is *payable* for gas by *Buyer under any such other agreement.*' (Emphasis supplied). It seems plain that since El Paso was not obliged to pay higher prices under its contracts with Shell and Hunt—as we found above—Superior could not claim an increased price under its contract. Accordingly, Superior's rate increase must also be rejected. United Gas Pipe Line Co. v. Mobile Gas Service Co., 350 U.S. 332 [76 S.Ct. 373, 100 L.Ed. 373] (1956)."

On the first issue set out above, the F.P.C. held that the El Paso purchase from West Texas did not serve to trigger any of the favored nation clauses before it and recited:

"* * * This exact issue has for all practical purposes been previously litigated in the Pure Oil case, Opinion No. 341, 25 FPC 383, aff'd (7 Cir. 1962) 299 F.2d 370. In fact, the increase sought

here is based on the same El Paso purchase from West Texas that was held not to trigger similar escalation clauses in the Pure Oil case.

"Our decision in Pure Oil, which we here reaffirm, is adequate authority to dispose of this issue. As is discussed below, the examiner properly held that Pure Oil is controlling, and that respondents fail to demonstrate that their gas is comparable to the West Texas gas, or that their favored-nation clauses have been triggered. He therefore concluded that respondents lack the 'contractual support' necessary to permit their proposed increases to be filed."

The order of the F.P.C. in Opinion No. 341, 25 FPC 383, referred to above, was reviewed by the United States Court of Appeals, Seventh Circuit, in an opinion dated February 26, 1962 (one day prior to the judgment of the trial court in the case before us on February 27, 1962) in Pure Oil Company v. Federal Power Commission, 299 F.2d 370. The following is quoted from the opinion of the Circuit Court which affirmed the order of the F.P.C.:

"Pure is an independent producer of natural gas subject to jurisdiction of the Commission. Pure has three contracts with El Paso for the sale of natural gas from the area in western Texas and southeastern New Mexico known as the Permian Basin. * * * Pursuant to regulations promulgated by the Commission under the Natural Gas Act, copies of these contracts were filed and became rate schedules. Each of the contracts * * * contains what is known as a two-party favored-nation clause providing, in effect, that if at any time the buyer, El Paso, should purchase from another seller any gas within a specified geographic area at a price 'higher' than that being paid Pure under the contract, El Paso, should immediately begin paying the same higher price to Pure. Each contract defines the term 'higher price' as

used in the favored-nation clause. * * *"

Then follows a recitation of the contract provisions regarding "higher price", which provisions are practically identical with those contained in the two favored nation clauses of the contracts under examination in the instant case, as embodied in the favored nation clauses of those contracts. Pure had contended before the F.P.C. and before the Circuit Court that the increase in rates sought was predicated upon the ground that the West Texas purchases by El Paso served to trigger the favored nation clauses of the Pure-El Paso contracts and entitle Pure to a 16 cents per Mcf rate on each of those contracts. This, as we understand it, is essentially the contention of Superior here, and was the contention of Superior and the other Respondents before the F.P.C. in Docket No. R161–515 from which Opinion No. 382 emanated: "They argued that these favored-nation clauses are valid and unambiguous, and that extrinsic evidence therefore may not be used to determine whether the price of gas sold under the West Texas contract is higher than the price of gas sold under respondents' contracts." On the other hand, El Paso protested such increased rates in the Pure case (as here) on the basis that the West Texas sales were not comparable to the Pure sales (or Superior's sales here) and that, accordingly the favored nation clauses had not been triggered. The F.P.C. upheld El Paso's contention, denied the proposed increase in rates as not contractually authorized, and ordered Pure to make refunds to El Paso (as it ordered respondents to do in Opinion No. 382). In arriving at this decision on the basis of the comparability of the sales of the two respective companies, the F.P.C. was upheld by the Circuit Court, which held:

"The West Texas contract made available to El Paso gas from two newly developed Permian Basin fields, Emperor Field and South Kermit Field. The record contains evidence that the reserves of these fields are quite sub-

stantial; that the fields possess the exceptional quality of gas flow at an extremely high pressure with a consequent delivery potential which makes the gas exceptionally useful for peaking purposes; and the Commission, in agreement with the Examiner, found this quality to be a pertinent factor under the 'higher price' provisions of the Pure contracts which, given due consideration, sufficiently distinguishes the gas purchases from West Texas from those under the Pure contracts to preclude the payment to West Texas from being regarded 'higher' than Pure's prices.

"The comparability provisions of the favored-nation clauses govern determination of whether a dollar and cents price, greater on its face, is actually higher when pertinent factors of the two transactions are compared. The clauses expressly enumerate certain of the contractual provisions or features which are to be considered in making such comparison. *Pure contends the determination of 'higher price' is limited to a comparison of these specified elements and such other pertinent factors as appear from the face of the contracts, and that the 'all other pertinent factors' provision of the clauses does not extend to a factor such as peaking quality or capacity, a quality not an express subject of some provision or term of the contracts.*" (Emphasis supplied).

This appears to be the contention of Superior in the instant case, as reflected by the prayer in Superior's petition, which requests the trial court to:

" * * * decree and declare (a) that each of the above quoted provisions of said contracts are plain, unambiguous, valid, legal and binding, (b) that the rights of the parties are fixed and governed by the express terms and provisions of said contracts as written and as some may be affected by written agreements as exist between defendant and any other party or parties providing for the purchase of residue gas or gas from dry gas or gas-distillate wells, as the case may be; * * * "

As regards this contention of Pure (and of Superior here), the Circuit Court continues:

"We agree with Pure that resolution of this issue of contract construction does not involve a matter which falls within the purview of Commission expertise but we are not persuaded by any of the arguments advanced by Pure that the record evinces an intention of the parties to limit the ordinary import and breadth of scope of the language 'all other pertinent factors' in the manner contended for by Pure. And, inasmuch as it is the actual *comparative values* which must determine the true relationship of prices as being *higher, equal or lower,* we perceive no error in the legal conclusion, inherent in the Commission's determination, that *the comparability clauses require consideration and comparison of all factors, whether or not the express subject of contract provision, which are pertinent to arriving at the value of the gas as delivered.* Such factors, while not embracing purely subjective elements which may represent value to the particular purchaser only, do include those attributes and characteristics which serve to measure the value for pipe line distribution purposes of the gas contracted to be delivered." (Emphasis supplied).

The Circuit Court then concludes, in affirming the opinion of the F.P.C.:

"Although the issue with reference to the scope of the comparability clauses is a matter of contract construction which does not here involve a subject within the Commission's special competence (Cf. Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208; Warren Petrole-

um Corp. v. Federal Power Commission, 10 Cir., 282 F.2d 312) the remaining issue *as to whether the gas purchased from West Texas possessed exceptional qualities for peaking purposes which enhance its value to the extent that its 16 Mcf price is not higher on a comparative basis than the prices of the gas furnished under Pure's contracts is, in our opinion, a matter subject to the application of the Commission's expert knowledge and judgment in a technical field.* And, so viewed, we are required to accept the Commission's findings and conclusions if they have warrant in the record and a reasonable basis in law. Cf. United Gas Pipe Line Co. v. Memphis Light, Gas and Water Division, 358 U.S. 103, 79 S.Ct. 194, 3 L.Ed. 2d 153; Unemployment Compensation Commission v. Aragon, 329 U.S. 143, 153–154, 67 S.Ct. 245, 91 L.Ed. 136.

"The record supports the Commission's conclusions regarding the exceptional physical characteristics of the West Texas gas supply. And, although the factor of location alone does not remove it from application of the favored-nation clauses, the desirable deliverability characteristics due to the extremely high pressure of the wells reasonably warrants the Commission's findings distinguishing the West Texas supply from Pure's gas and that its usefulness and exceptional value for peaking purposes required a conclusion that its price was not actually higher than Pure's *on a comparative basis.*" (Emphasis supplied).

We feel that the foregoing quotations from the opinion of the Circuit Court in the Pure Oil case effectively dispose of the contention of Superior in the case before us. In its brief, Superior states that it "prayed that the (trial) court construe the contracts and the mentioned (favored-nation) clauses to be plain, unambiguous, valid, legal and binding and *declare the rights of the parties thereunder* in the light of the existing facts as alleged. It appears to us that the underscored portion of the prayer of Superior makes the instant case fall precisely within that technical field which calls for the application of the Federal Power Commission's expert knowledge and judgment, as spoken of in the opinion by the Circuit Court. The two cases referred to by the court as involving a subject of contract construction not within the Commission's special competence are not in disharmony with the decision we have reached in this case. In the Texas Gas Transmission case the Supreme Court held that the F.P.C., in interpreting a "favored nation" clause, had treated the matter as one to be determined simply by the application of ordinary rules of contract construction, and had not arrived at its interpretation of the clause on the basis of specialized knowledge gained from experience in regulation of the natural gas business. The court in the Warren Petroleum case similarly held that "It is quite apparent that the Commission's refusal to accept the rate filing was based upon its construction of the contract provisions and the application of ordinary principles of contract law, and not upon its experiences in the administration of the Natural Gas Act." In the Pure Oil case the court held that, as pointed out, the determination of the "rights of the parties", (a determination prayed for by Superior here) involved the application of the F.P.C.'s expert knowledge and judgment in a technical field.

We are of the opinion and find that, in so far as this case is concerned, this field was preempted, and properly so, by the F.P.C. in the instant case, and that the trial court here, confronted by that fact and the decision of the Circuit Court on February 26, 1962 confirming the findings and order of the Commission, properly held on February 27, 1962 that Superior's suit be dismissed for lack of jurisdiction.

We have tried to analyze the numerous authorities cited or quoted from by both parties to this cause in their various and exhaustive briefs, and find no authority fundamentally at variance with our conclusion here expressed.

However, we are of the further opinion and find that the trial court, being without jurisdiction in the cause, improvidently passed on and by its order denied plaintiff's motion for summary judgment, and the judgment of the trial court must be, and is, modified to the extent of deleting such order. In all other respects the judgment of the trial court is affirmed.