# TEXAS GAS TRANSMISSION CORP. ET AL. *v.* SHELL OIL CO.

No. 167.  Argued April 20–21, 1960.—Decided June 13, 1960.*

---

*Together with No. 170, *Federal Power Commission* v. *Shell Oil Co.*, also on certiorari to the same Court.

*Mathias F. Correa* argued the cause for petitioners in No. 167. With him on the brief were *Gavin H. Cochran* and *Lawrence W. Keepnews.*

*Willard W. Gatchell* argued the cause for petitioner in No. 170. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub, Daniel M. Friedman, Samuel D. Slade, Anthony L. Mondello* and *Howard E. Wahrenbrock.*

*Oliver L. Stone* argued the cause for respondent. With him on the brief were *William F. Kenney* and *George C. Schoenberger, Jr.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

One of the series of orders issued by the Federal Power Commission after this Court's decision in *Phillips Petroleum Co.* v. *Wisconsin,* 347 U. S. 672, required affected independent producers of natural gas to submit rate schedules in effect on June 7, 1954, the date *Phillips* was decided.[1] The respondent, Shell Oil Company, on November 18, 1954, submitted its contract dated May 1,

---

[1] The *Phillips* case held that the Commission had jurisdiction over the independent producers and the order in question was Order No. 174–B now incorporated in Regulations under the Natural Gas Act, 18 CFR §§ 154.92–154.93.

1951, with Texas Gas Transmission Corporation,[2] as a rate schedule on June 7, 1954, for gas from its Chalkley Field, Cameron Parish, Louisiana. The Commission, on March 13, 1957, accepted the contract as a rate schedule but ordered a hearing for the purpose of determining and fixing the price effective thereunder on June 7, 1954.[3]

At the hearing, Texas Gas contended that paragraph 1 of Article VI of the contract specifying the price of 8.997 cents per thousand cubic feet (Mcf.) for the period which included June 7, 1954, established that price for the date.[4] This was the price at which Shell was billing Texas Gas for gas at the time. However, Shell contended that when Texas Gas, prior to June 7, 1954, began paying 12.5 cents per Mcf. to Atlantic Refining Company, for gas produced in nearby Acadia Parish, Shell became entitled to receive the same price under the so-called "favored nation" clause of the Shell contract. That clause, paragraph 3 of Article VI, provides that "[i]f at

---

[2] The contract was actually between Shell and Louisiana Natural Gas Corporation, a wholly owned subsidiary of the petitioner, Texas Gas Transmission Corporation. The subsidiary was merged into its parent in 1955.

[3] The hearing was ordered after Shell filed on February 11, 1957, an application for a rate increase from 12.5 cents per thousand cubic feet (Mcf.) to 16.75 cents per Mcf. plus tax reimbursement. This price increase has been suspended and is pending before the Commission in another proceeding. The Commission noted in its opinion herein that it was "necessary in connection with any rate proceeding after suspension of increased rates . . . that we know the rate previously in effect . . . ." 18 F. P. C. 617, 618. Texas Gas and its customer, the other petitioner in No. 167, Louisville Gas and Electric Company, were permitted to intervene in these proceedings.

[4] Article VI, paragraph 1, provides in pertinent part:

"1. The prices to be paid by Buyer for gas hereunder shall be as follows:

.        .        .        .        .

"For all gas purchased from January 1, 1952, through December 31, 1956. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8.9970¢ per 1000 cu. ft."

any time after December 31, 1951, [Texas Gas] shall enter into a contract providing for the purchase by it of gas" at a higher price [than that currently being paid under this—the Shell—contract], the price currently being paid will be increased to equal the "price payable under such other contract." [5]

When Texas Gas and Shell made the contract of May 1, 1951, Atlantic Refining Company was selling gas to the former from Acadia Parish production under a contract concluded in 1943 for a 25-year term. The Atlantic contract specified a price effective for the first five years and provided that during succeeding five-year periods, "prices to be paid will be determined at the beginning of each period . . . ." "The price to be paid . . . is to be agreed upon . . . after a survey of prevailing prices for gas being sold in similar quantities in the southwestern part of Louisiana." The contract further provided that "[i]n the event that the parties are unable to agree upon the price . . . such determination shall be submitted to arbi-

---

[5] Paragraph 3 of Article VI is as follows:

"If at any time after December 31, 1951, Buyer shall enter into a contract providing for the purchase by it of gas produced from a field or fields located, and delivered to Buyer, within a radius of fifty (50) miles of any point of delivery provided hereunder, Buyer shall forthwith notify Seller of such fact, and if the price per one thousand (1000) cubic feet at any time payable under such other contract is higher than the price payable hereunder, each price payable hereunder which is less than the price payable at the same time under such other contract shall be immediately increased so that it will equal the price payable under such other contract. In determining whether the price payable under such other contract is 'higher' than the price payable for gas under this contract, due consideration shall be given to the provisions of this contract as compared with such other contract as to quality of gas; delivery pressures, gathering and compressing arrangements, quantity, provisions regarding measurement of gas, including deviation from Boyle's Law, taxes payable on or in respect of gas delivered and all other pertinent factors."

tration"; the arbitrators to be selected as provided in the agreement.[6] Negotiations between Atlantic and Texas Gas as to the price to be effective for the five-year period beginning September 1, 1953, terminated with a letter agreement dated February 17, 1954, which recited: "[I]t is hereby agreed that the price to be paid . . . between September 1, 1953, and August 31, 1958, both inclusive, shall be 12.2 cents net" plus .3 cent for severance tax, or 12.5 cents. It is this letter agreement which Shell contends triggered the Shell contract's "favored nation" clause.

The Commission's examiner issued his decision on August 9, 1957. He held that in making the Atlantic letter agreement Texas Gas "enter[ed] into a contract providing for the purchase by it of gas" within the meaning of the Shell "favored nation" clause and that this had escalated the Shell price to 12.5 cents per Mcf. The Com-

---

[6] The pertinent provisions are in Article III of the 1943 Atlantic contract reading as follows:

"The Buyer agrees to pay for the gas received hereunder a price computed as follows:

.        .        .        .        .

"(b) At the end of the first five-year period, Buyer and Seller are to reach an agreement as to the price for gas sold and delivered under this contract during the second five-year period. The price to be paid during such second five-year period is to be agreed upon at the beginning of such period after a survey of prevailing prices for gas being sold in similar quantities in the southwestern part of Louisiana.

"(c) During succeeding five-year periods, prices to be paid will be determined at the beginning of each period in the same manner as provided for in paragraph (b) above.

"(d) In the event that the parties are unable to agree upon the price to be paid for gas after the first five-year period, in accordance with the arrangements set forth in paragraphs (b) and (c) above, such determination shall be submitted to arbitration in accordance with Condition XII."

mission reversed the examiner's decision and determined that the effective price on June 7, 1954, was 8.997 cents per Mcf., the price fixed in paragraph 1 of Article VI. 18 F. P. C. 617. Shell's petition for rehearing was denied. 19 F. P. C. 74. The Court of Appeals for the Third Circuit, on review, vacated the Commission's order. 263 F. 2d 223. We granted the separate petitions for certiorari of Texas Gas and Louisville Gas and Electric Company in No. 167, and of the Federal Power Commission in No. 170, being particularly moved to do so by the contention made in both petitions that the Court of Appeals exceeded the appropriate scope of judicial review of the Commission's determination. 361 U. S. 811.

We may assume with the petitioners that the Court of Appeals did not treat the Commission's order as one which it was required to accept if reasonably supported in the record, and instead considered that it could examine *de novo* the question of the proper interpretation to be given the Shell "favored nation" clause. The petitioners' argument that the Court of Appeals exceeded the allowable limits of judicial review is based upon the premise that the Commission's interpretation of the "favored nation" clause reflects the application of its expert knowledge and judgment to a highly technical field, so that the Court of Appeals was required to accept the Commission's interpretation if it had " 'warrant in the record' and a 'reasonable basis in law,' " citing *Unemployment Compensation Comm'n* v. *Aragon,* 329 U. S. 143, 153–154. But the record nowhere discloses that the Commission arrived at its interpretation of the "favored nation" clause on the basis of specialized knowledge gained from experience in the regulation of the natural gas business, or upon the basis of any trade practice concerning "favored nation" clauses. On the contrary the opinions of the examiner and the Commission show that both treated the question as one to be determined

simply by the application of ordinary rules of contract construction. The examiner stated that "[t]he language [of the "favored nation" clause] is clear enough to reveal the intent of the parties without resort to parole evidence or self-serving memoranda. . . . [I]ts plain meaning is . . . Shell sought to cause its selling price to rise to that called for by any other contract Buyer made for gas after an agreed date . . . . The language was evidently broad; not narrowly technical in character." The examiner concluded that "elemental principles of contract law . . . too commonly known to the legal profession to require citations in support thereof" compelled the decision he reached. The Commission, in turn, relying for authority entirely upon court decisions and texts, construed the "favored nation" clause to be applicable only when Texas Gas entered into a "new" contract after December 31, 1951, and held that the February 17, 1954, "agreement with Atlantic does not constitute a new contract as required by Shell's escalation clause, but merely represents action taken under a pre-existing contract between Texas Gas and Atlantic." 18 F. P. C., at 618–619. It is apparent that the Commission rested its determination upon a construction of the words of the contract as it supposed a court would interpret them.[7]

---

[7] The Commission reached its conclusion as to the interpretation of the "favored nation" clause without dissent. There was one dissent, by Commissioner Connole, from an alternative ground of decision, namely, that the effective rate on June 7, 1954, was 8.997 cents per Mcf. because that was the charge actually being collected from Texas Gas. 18 F. P. C. 621. The Court of Appeals found no merit in this ground saying "What that rate was . . . depends upon the contract-established provisions rather than on the fortuity of rates which were being actually paid on that date." 263 F. 2d, at 224. The Commission did not present this question among the Questions Presented in its petition for certiorari and we intimate no view upon its merits.

"The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *Securities & Exchange Comm'n* v. *Chenery Corp.*, 318 U. S. 80, 87. Therefore, since the Commission professed to dispose of the case solely upon its view of the result called for by the application of canons of contract construction employed by the courts, and did not in any wise rely on matters within its special competence, the Court of Appeals was fully justified in making its own independent determination of the correct application of the governing principles. See *Federal Communications Comm'n* v. *RCA Communications, Inc.*, 346 U. S. 86, 91. There applies here what the Court said in *Chenery:* "Since the decision of the Commission was explicitly based upon the applicability of principles [of contract interpretation] announced by courts, its validity must likewise be judged on that basis." 318 U. S., at 87.

In the circumstances, considerations of the scope of review of administrative determinations need not deter us from reviewing the decision of the Court of Appeals and deciding the proper construction of the "favored nation" clause. We proceed to do so since the question of interpretation of the clause was presented in both petitions, our grant of certiorari was not limited to exclude it, and the question has been briefed and argued.

The question to be decided is: did the parties to the Shell contract mean that an agreement of the nature of the Atlantic letter agreement of February 17, 1954, should constitute the "enter[ing] into a contract [by Texas Gas] providing for the purchase by it of gas . . ."? We first consider the nature of the letter agreement. The pricing provisions of the Atlantic contract specify a price for the first five-year period, and provide that prices for the four succeeding five-year periods should be determined by agreement of the parties, or failing such agreement, by

arbitration.[8]  In either case the determination is to be made "after a survey of prevailing prices for gas being sold in similar quantities in the southwestern part of Louisiana."  Pursuant to this provision a letter agreement dated October 29, 1948, and a modification agreement dated February 16, 1949, established prices for the five-year period from September 1, 1948, to August 31, 1953.  The letter agreement of February 17, 1954, setting the price for the 1953–1958 period was thus the second such agreement.

Shell urges that the letter agreement is in actuality an entirely new contract which incorporates by inferential reference the terms of the 1943 contract.  There is nothing in the letter agreement or otherwise in the record to substantiate this contention.  On the contrary, the letter agreement affirmatively states that the action was taken "in accordance with" the 1943 contract.[9]

---

[8] For purposes of its decision the Court of Appeals "assumed without deciding that the Atlantic contract of 1943 did in fact impose a binding agreement-to-agree on the price for gas in each of the contract's last four five year periods."  263 F. 2d, at 226.  We proceed on the same assumption in reviewing the interpretation of the "favored nation" clause in the Shell contract.

[9] The pertinent text of the letter is as follows:

"Under date of September 1, 1943, Defense Plant Corporation, as Buyer, entered into a gas purchase contract with The Atlantic Refining Company, as Seller, for the purchase of gas produced from Seller's leases in the North Tepetate pool of Acadia Parish, Louisiana, which contract was subsequently amended February 16, 1949.  Louisiana Natural Gas Corporation purchased the pipe line operated by Defense Plant Corporation and the aforesaid contract with The Atlantic Refining Company was assigned to Louisiana Natural Gas Corporation.

"In accordance with Paragraph III of said [1943] contract, it is hereby agreed that the price to be paid by Louisiana Natural Gas Corporation to The Atlantic Refining Company for gas sold and delivered under such contract between September 1, 1953, and August 31, 1958, both inclusive, shall be 12.2 cents net for each 1,000 cubic feet at a pressure base of 15.025 psia of gas received at the central point or points set forth in the original contract, regardless of whether

To be sure, the letter agreement may be said to have been a "contract" insofar as Atlantic and Texas Gas agreed therein upon a price and gave up the right to have arbitrators determine the price for them. But their act was merely in the performance of an undertaking they assumed in 1943 when they chose this binding method for periodic price adjustments instead of some method which would have foreordained the adjustments in precise amounts. The letter agreement in discharge of this obligation assumed in 1943 is thus simply "executory of the [1943] contract between the parties." *Phillips Petroleum Co.* v. *Federal Power Comm'n*, 227 F. 2d 470, 475. We therefore agree with the Commission's holding that the letter agreement "merely represents action taken under a pre-existing contract between Texas Gas and Atlantic." 18 F. P. C., at 619.

In the light of this, we do not think that in being party to the letter agreement Texas Gas "enter[ed] into a contract for the purchase . . . of gas" within the meaning of those words as employed by the parties in the "favored nation" clause. The language of that clause of the Shell contract is virtually the same as the parties used several times at the very outset of that contract. The sense in which the parties used the language there reveals its meaning in the "favored nation" clause and, so interpreted, the Atlantic letter agreement is not a "contract" within the meaning of the clause. The contract begins:

"This Contract, made and *entered into* as of May 1, 1951 . . .

"Whereas, under date of October 1, 1943, Shell Oil Company, Inc., *entered into a contract for the sale of gas* . . .

---

such gas is delivered to a government plant or not; and, in addition, Buyer shall reimburse Seller for all state severance taxes, or similar taxes, which Seller is obligated to pay and has paid to the State of Louisiana on such gas."

"Whereas, . . . Buyer and Seller now desire to rescind said contract and *enter into a new contract for the purchase of gas . . . .*" (Emphasis added.)

What follows are the nine Articles which detail the many aspects of the parties' relationship for the 20-year term of the contract. The Articles are captioned "Sale of Gas," "Quantity of Gas," "Pressure Decline," "Point of Delivery," "Warranty of Title to Gas," "Prices," "Arbitration," "Term of Contract," and "Miscellaneous." In addition an exhibit made part of the contract deals with such matters as "Quality of Gas," "Measurements," "Billing and Payment," "Regulatory Bodies" and "Force Majeure." In other words "enter[ing] into a contract providing for the purchase of gas" meant to the parties the making of a full-fledged contract containing all the terms defining the complete relationship.

This conclusion is borne out in the "Prices" Article itself. That Article divides the contract term into five periods, one from May 1, 1951, until January 1, 1952, and four others each of five years. Paragraph 1 specifies the price for each period according to a schedule of automatic step-increases. Adjustment otherwise to higher prices may result in one of two ways: (1) under paragraph 3, the "favored nation" clause, or (2) under paragraph 4—applicable only to the last two five-year periods—if Shell requests a "price redetermination." Upon such request "determination is to be made by the parties or, if they are unable to agree, by the arbitrators" upon the basis of "the three (3) highest prices to be paid during such period by operating interstate transporters of natural gas, including [Texas Gas]" for gas purchased from named Louisiana fields.

In all probability any "price redetermination" agreed upon by Shell and Texas Gas under paragraph 4 would be evidenced by a writing stating the determination. Surely the parties who used the language "enter[ing] into

a contract" as they did in the preamble to their agreement would not conceive of such a "price redetermination" as "enter[ing] into a contract providing for the purchase . . . of gas." No more does the similar periodic price adjustment under the Atlantic contract partake of the nature of "enter[ing] into a contract providing for the purchase . . . of gas," within the meaning of the language of the Shell "favored nation" clause.

The Court of Appeals, in holding that the letter agreement came within the intendment of "enter[ing] into a contract providing for the purchase . . . of gas," stressed that Shell's objective was to assure itself a "top price for its gas" and said that the facts tended to show "that the intention of the parties was for any higher price paid by [Texas Gas] to another producer to trigger a rise on the Shell contract to the same figure . . . ." 263 F. 2d, at 225. We think the contract demonstrates the contrary, and we find the record barren of any other evidence which would support this conclusion. Of course, we recognize that Shell desired to protect itself during so extended a contract period by provisions for price increases; and it did so. Indeed in this respect the contract is a one-way street. Shell is guaranteed automatic periodic step-increases and in addition, during the last 10 years of the contract term, at Shell's option, prices are to be redetermined to reflect any higher prevailing market prices. Then there is the "favored nation" clause—also part of the protection afforded Shell. Shell is entitled to the highest price which any of these methods will yield. In contrast, there is no provision allowing Texas Gas the possibility of a price decrease.

Even assuming that the parties assigned paramount importance to giving Shell the "top price," the "favored nation" clause as written is not as broad as it might have been. Shell has made other contracts with "favored nation" clauses which are triggered by *every* higher price

paid by the buyer to other producers.[10]   In contrast, Shell
concedes that this "favored nation" clause would not be
triggered by higher prices paid by Texas Gas to other
producers under pre-existing contracts by way of auto-
matic increases or increases which are mathematically
determined.  The most reasonable explanation for the
inclusion of the concededly more limited clause is that
the parties meant to distinguish between increases
which Texas Gas was contractually bound to pay under
provisions of pre-1951 contracts and higher prices which
Texas Gas voluntarily assumed to pay after 1951.  In
deciding which increases do and which do not trigger this
"favored nation" clause we would be making an irrational
distinction were we to focus upon the mechanics chosen in
the Atlantic contract and conclude that the Shell clause
was activated by a post-1951 price determination under
the Atlantic contract, although it would not have been
activated by price increases pursuant to a more mathe-
matically precise formula.  In its essential respects the
Atlantic price adjustment was no different from the latter,

---

[10] For example the Commission's opinion on the order denying
rehearing, 19 F. P. C., at 77, states:

"For instance in Shell's Gas Rate Schedule No. 4 it is provided:

" 'If at any time or times the price per Mcf of gas or dry gas
purchased by [the Buyer] from any gas producer whomever . . .
shall be greater than the price per Mcf of gas purchased hereunder,
[the Buyer] will increase the price per Mcf payable to [Shell] for
gas delivered hereunder. . . .'

"In Shell's Gas Rate Schedule No. 7, it is provided:

" 'Buyer agrees that if, during the term of this agreement, it pur-
chases or agrees to purchase natural gas at any place within a distance
of twenty-five (25) miles of the delivery point under the present
contract, at a price or prices higher . . . than the prices provided for
by the present contract, . . . it will, upon seller's request, thereafter
pay to seller a price or prices under the present agreement not less
than the higher price so being paid.'

"There are numerous other examples included in the present
record."

for the Atlantic adjustment was required under a pre-existing contract, and Texas Gas was powerless to prevent it.

We therefore hold that the Court of Appeals erred in its interpretation of the "favored nation" clause and that the Commission correctly construed it as not effecting an increase in price by reason of the letter agreement.

There remains for mention an argument of Shell which the Court of Appeals found unnecessary to consider because of the rationale which it adopted. This is the contention that the 1943 Atlantic agreement did not provide for a fixed and determined price beyond the first five-year period, so that under applicable state law enforceability was suspended until the contract price for a particular succeeding five-year term was supplied by agreement or arbitration. From this premise it is argued that when the second five-year period came to an end on August 31, 1953, neither Atlantic nor Texas Gas was under any enforceable obligation to continue the prior relationship and therefore when on February 17, 1954, Texas Gas signed the letter agreement it was not acting pursuant to any pre-existing obligation but was exercising its free choice to enter what was in effect a new contract. In its petition for writ of certiorari the Commission argued that not only was there no doubt about the enforceability of the Atlantic contract but that the issue is immaterial because the parties to that contract treated the contract as binding and that it is not for Shell, a stranger to the contract, to say that it was not legally enforceable. However, the Commission suggested that should we reverse the decision of the Court of Appeals, premised as it is upon the assumption that the 1943 Atlantic contract imposed a binding obligation for its entire stated term, and if we considered the question of enforceability to be material, we should remand the issue of enforceability to the Court of Appeals for its decision. Shell has main-

tained in this Court that the issue of enforceability is material but, in view of the Commission's statement, has argued neither that issue nor the issue of enforceability. We agree that it is appropriate that the Court of Appeals address itself to the enforceability issue, if it is material, but under the circumstances we think the Court of Appeals should first decide the question of materiality.[11]   We therefore reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

*It is so ordered.*

MR. JUSTICE BLACK concurs in the result.

---

[11] We do not read the following statement of the Court of Appeals as foreclosing the Commission's argument that the issue of enforceability is not material:

"We have assumed without deciding that the Atlantic contract of 1943 did in fact impose a binding agreement-to-agree on the price for gas in each of the contract's last four five year periods.  Thus it has not been necessary to determine the several questions raised in connection with the arguments directed to that phase of the case.  Of course if the Atlantic contract of 1943 was not a binding agreement-to-agree, that circumstance alone would place the February, 1954 Atlantic contract fully within the terms of the escalation clause in the Shell contract."  263 F. 2d, at 226.