Frederick W. LOWEY, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants.

John A. GALLAGHER, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants.

J. E. HAM, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants.

Heinz and Ursula LICHTENSTEIN, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants.

James M. ROSS, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants,

v.

Eloise B. MILLER, Defendant Intervenor.

Richard K. VITEK, et al., Plaintiffs,

v.

James E. WATT,* et al., Defendants.

Civ. Nos. 79–3314 to 79–3319.

United States District Court, District of Columbia.

May 28, 1981.

* Secretary Watt has been substituted for Secretary Andrus pursuant to Federal Rule of Civil Procedure 25(d)(1).

Irving Jaffe, Washington, D. C., for plaintiffs.

William E. Hill, Land & Natural Resources Div., Dept. of Justice, Washington, D. C., for federal defendants.

Jason R. Warran, Washington, D. C., for intervenor Eloise B. Miller.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

These six consolidated cases are before the court on cross-motions for summary judgment. Jurisdiction is based on 28 U.S.C. § 1361 and 5 U.S.C. § 701 et seq. There is no genuine issue of material fact. For the reasons that follow, we conclude that defendant and defendant-intervenor are entitled to summary judgment.

### Facts

Section 17(c) of the Mineral Lands Leasing Act of 1920 [1] authorizes the Secretary of the Interior to issue oil and gas leases on public lands to the qualified "person first making application." These "noncompetitive leases" are issued only for lands that are "not within any known geological structure of a producing oil or gas field." Any person who desires to obtain a lease for a particular parcel may file an entry card with the state office of the Bureau of Land Management (BLM) in which the parcel is located, and leases are then awarded by lottery at periodic drawings. Three entry cards are drawn for each parcel. If the first drawn offeror is qualified to hold the lease, the Secretary may issue it to him; if not, the qualifications of the second drawn offeror are examined, and so on.[2] Offers to lease (i. e., entry cards) must strictly comply with the requirements set out in the Department's regulations.[3] These regulations provide, inter alia, that an offeror must identify any other parties who have an "interest" in the offer and lease.[4] An "interest" includes "[a]ny claim or any prospective or future claim to an advantage or benefit from a lease, and any participation

---

1. 30 U.S.C. § 226(c) (as amended) (1976).

2. 43 C.F.R. § 3112.2–1(a)(3) (1978).

3. See generally 43 C.F.R. §§ 3102, 3112 (1978).

4. 43 C.F.R. § 3102.7 provides,
   *Showing as to sole party in interest.*
   A signed statement by the offeror that he is the sole party in interest in the offer and the lease, if issued; if not he shall set forth the names of the other interested parties. If there are other parties interested in the offer a separate statement must be signed by them

and by the offeror, setting forth the nature and extent of the interest of each in the offer, the nature of the agreement between them if oral, and a copy of such agreement if written. . . . Such separate statement and written agreement, if any, must be filed not later than 15 days after the filing of the lease offer. Failure to file the statement and written agreement within the time allowed will result in the cancellation of any lease that may have been issued pursuant to the offer.

or any defined or undefined share in any increments, issues, or profits which may be derived from ... the lease."[5] In addition, "multiple filings" by the same party are prohibited.[6]

Plaintiffs here are seven offerors drawn first on six different noncompetitive leases in New Mexico.[7] All were clients of Fred L. Engle, doing business as Resource Service Company (RSC), a coplaintiff in all six cases. RSC is a "filing service" located in Wauwatosa, Wisconsin. Pursuant to its standard service agreement, RSC filed entry cards for its clients on selected parcels for a fee of $20 per entry. The service agreement granted RSC the exclusive right to market any lease won by its clients for five years and provided for a percentage commission in return. Although the cases before us concern RSC's representation of its clients in drawings for New Mexico leases, prior proceedings in which RSC clients were disqualified from Wyoming lotteries are relevant and will be discussed here.

In December of 1976 a protest was filed with the Wyoming State Office of the BLM demanding disqualification of several RSC clients who were the first drawn offerors in the November 1976 drawing for leases in Wyoming. The protest alleged that RSC's exclusive agency provision violated the regulations concerning disclosure of interested parties and multiple filings. Wyoming BLM officials sustained the protest and disqualified the offerors. Engle and RSC's attorney Harry W. Theuerkauf argued, however, that this initial determination was in error, that RSC would appeal, and that, pending a final determination of the agency provision's validity, it would be unduly burdensome for RSC to notify all of its clients. Based on these arguments, three officials of the Wyoming BLM agreed not to disqualify any additional RSC clients if RSC would disclaim its rights under the exclusive agency provision. RSC's disclaimer, filed with the Wyoming BLM on January 13, 1977, provided,

WHEREAS, the undersigned, FRED ENGLE, d/b/a RESOURCE SERVICE COMPANY, is a party to various contracts designated as service agreements with various customers for drawings connected with the issuance of non-competitive oil and gas lease rights ..., and

. . . . .

WHEREAS, it is the understanding and intention of the undersigned and the understanding and intention of the undersigned's customers that said exclusive agency does not vest in the undersigned any lease or offer to lease which may disqualify from [sic] obtaining a lease under said program, and

WHEREAS, the United States Department of the Interior, Bureau of Land Management has not determined whether said exclusive agency vests in the undersigned an interest in the lease or offer to lease of an offeror, and

WHEREAS, it is possible that the Bureau of Land Management may opine that said exclusive agency, in fact, vests in the undersigned an interest in the lease or offer to lease of an offeror, and

WHEREAS, it is the intention and desire of the undersigned to avoid any adverse consequences or delays which may result should the Bureau of Land Management adopt such an opinion.

NOW, THEREFORE, I, FRED ENGLE, ... do hereby state and aver that I do hereby waive and renounce any exclusive agency which I may have by reason of said service agreements with said offerors from and after this date.

I do hereby further state and aver that said waiver and renunciation shall become operative forthwith and shall inure forthwith for the benefit of all said offerors.

I do hereby further state and aver that this Amendment to said service agree-

---

5. 43 C.F.R. § 3100.0–5(b) (1978).

6. 43 C.F.R. § 3112.5–2 (1978).

7. Heinz and Ursula Lichtenstein were coofferors on a parcel.

ments is expressly made on the premise and understanding that said exclusive agency does not create an interest in me but that this disclaimer is being made in the event that a determination is made that the exclusive agency vests in me an interest in the lease or offer to lease which may disqualify the offeror.

I do hereby further state and aver that in the event a determination is made following the exhaustion of all administrative remedies and judicial remedies that said exclusive agency does not constitute an interest of the undersigned in said oil and gas leases, then and in that event this Amendment and Disclaimer shall be null and void as if never executed.[8]

The Wyoming BLM officials required RSC to notify its winning clients of the disclaimer and to provide the BLM with the names of its winning clients.[9] The Wyoming officials agreed that it would be unnecessary at that time for RSC to notify its other clients of the disclaimer.[10] RSC filed the same disclaimer with the New Mexico State Office of the BLM on March 29, 1977, but did not contact them further to explain its operation until January 31, 1978, some ten months later, after an RSC client was drawn first in a New Mexico lottery.[11] As stated previously, it is New Mexico leases that are involved in the present proceeding.

RSC appealed the Wyoming BLM's determination that the agency provision gave RSC an interest in its clients' offers. In the meantime, in accordance with its acceptance of RSC's disclaimer, the Wyoming BLM dismissed subsequent protests by other offerors.[12] RSC continued to provide the Wyoming BLM with lists of its winning clients for the next fourteen months.[13] It also sent letters to its winning clients that stated,

> Congratulations on your winning of Parcel [ ]. . . .

> .    .    .    .    .

> We are in the process of working with the Bureau of Land Management in an effort to determine if the Sales Agreement portion of our Service Agreement presents a "sole party in interest" question. . . . To remove *any* doubt that our clients are in fact the exclusive owners of their leases and to protect their best interests we have informed the Bureau that we do not consider this exclusive clause binding if it created an interest in us. The Bureau has suggested that if the Sales Agreement is signed *after* the drawing there is no question presented.

> I am therefore enclosing two copies of our Sales Agreement which I would appreciate your signing and return one copy to me. . . . Please note that the Sales Agreement spells out the same terms as provided in the Service Agreement. We are confident that our past record of sales and our extensive contacts will enable us

---

8. Administrative Record (A.R.) at 201–02. The government submitted to the court a 345 page unpaginated and unbound administrative record. We have paginated it for reference.

9. *See generally* A.R. at 10–15, 44–47, 49–50, 54–55, 210–14.

10. *Id.* at 210–11, ¶ 5; 212, ¶ 4.

11. *Id.* at 251 (letter from Fred L. Engle to Paul E. Martinez, January 31, 1978).

12. An April 12, 1977 letter from the Wyoming BLM to the protester stated,
   > Your protest against issuance of the . . . referenced oil and gas leases . . . is hereby rejected for the following reasons: By agreement between this office and Mr. Fred Engle

of the Resource Service Company, the objectionable portions of that company's service agreement have been eliminated. By amendment and disclaimer dated January 13, 1977, Mr. Engle has waived all rights to an exclusive agency to sell his clients' leases as set out in the original service agreement. Until he can put newly printed forms into use, Mr. Engle will notify any of his clients who are winners in our simultaneous drawings that they are not bound by the exclusive agency agreement. The clients so notified will be invited to execute new agreements if they desire to do so after they are notified of winning a drawing. This procedure will conform to our regulations.
   *Id.* at 216. *See also id.* at 217–18.

13. *See e. g.,* A.R. at 44–50, 52, 54–55.

to put our best efforts to the sale of this lease to your profitable advantage.[14]

It is apparent that the words "waiver" and "disclaimer" did not appear in the letters. Only one winning RSC client exercised its option not to use RSC as its sales agent.

In August and September of 1977, the Interior Board of Land Appeals (IBLA) affirmed the Wyoming BLM's initial determination that RSC's service agreements gave it an impermissible interest in its clients' offers to lease. *Lola I. Doe*, 31 IBLA 394 (August 19, 1977); *Sidney H. Schreter*, 32 IBLA 148 (September 12, 1977). On October 25, 1977, since the agency provision had been invalidated by the IBLA, the Wyoming BLM asked RSC for a copy of its new service agreement. However, Theuerkauf said that RSC would appeal the *Doe* and *Schreter* decisions, and so the BLM officials did not press the issue. On January 4, 1978, after the ninety day period for seeking review had passed[15] and RSC had not appealed, the Wyoming BLM again asked for "evidence" that the service agreement had been revised.[16] On March 17, 1978, the Wyoming BLM approved RSC's new service agreement without the agency provision.[17]

While the *Doe* and *Schreter* cases were under consideration, another protest, also involving a Wyoming lease, was filed against the first place offeror in the May 1977 drawing, another RSC client named Coyer. The Wyoming BLM dismissed the protest, again on the grounds that the disclaimer effectively eliminated RSC's interest in the lease offers. The protester, Easterday, appealed to the IBLA. RSC and Coyer were served but did not appear. On March 22, 1978, the IBLA reversed the Wyoming BLM and held RSC's disclaimer ineffective to eliminate its impermissible interest. *Alfred L. Easterday*, 34 IBLA 195 (1978). Coyer and RSC filed suit in the United States District Court for the District of Wyoming to overturn the *Easterday* ruling. On February 12, 1979, United States District Judge Ewing T. Kerr remanded the case to the Wyoming State Office for a full hearing. Judge Kerr stated, "The record is in such a state of confusion that an intelligent review is not possible. . . ."[18] A hearing was held before an administrative law judge, and on October 14, 1980, the IBLA adopted the administrative law judge's proposed findings and reaffirmed its previous decision in *Easterday*. RSC again appealed to the district court. On March 5, 1981, Judge Kerr affirmed the IBLA ruling, granted summary judgment for Easterday, and dismissed the action.[19]

The instant cases arose from yet a third set of protests filed to disqualify RSC clients because of the exclusive agency provisions. Plaintiffs here all signed service agreements before the March 1978 revision.[20] All were first drawn offerors in the

14. *Id.* at 208 (letter from Fred L. Engle to Frederick W. Lowey, February 7, 1978) (emphasis in original).

15. *See* 30 U.S.C. § 226–2.

16. *Id.* at 51.

17. *Id.* at 57. The Wyoming BLM initially rejected RSC's revised service agreement because RSC presented its clients with a "Sale Agency Offer" before the drawings. *Id.* at 53. The service agreement finally accepted withheld the agency offer until after a client won a lottery.

18. *Id.* at 27–29.

19. *Donald W. Coyer, et al. v. Cecil D. Andrus*, Nos. C78–104K, C80–370K, and C80–372K (consol.) (D.Wyo., Order filed Mar. 5, 1981).

20. Four of the agreements, Ross, Lowey, Lichtenstein, and Ham, were signed after *Doe*. The fifth, Vitek, was signed after the disclaimer was filed but before *Doe*. The sixth, Gallagher, was signed before RSC filed its disclaimer with the BLM. The following table summarizes the six cases before us:

| Civil Action No. | Offeror(s) | Date Service Agreement Signed | Date of Drawing |
|---|---|---|---|
| 79–3314 | Lowey | December 13, 1977 | January 23, 1978 |
| 79–3315 | Gallagher | January 16, 1976 | April 27, 1978 |
| 79–3316 | Ham | January 4, 1978 | January 23, 1978 |
| 79–3317 | Lichtenstein | December 6, 1977 | February 19, 1977 |
| 79–3318 | Ross | November 16, 1977 | November 29, 1977 |
| 79–3319 | Vitek | July 15, 1977 | November 29, 1977 |

New Mexico drawings from November 1977 to April 1978. The New Mexico BLM disqualified plaintiffs on the grounds that the agency provision gave RSC an interest (citing *Doe*) and that the disclaimer did not cure this infirmity. RSC and its clients appealed and on May 14, 1979, the IBLA upheld the disqualifications, relying heavily on its conclusion in *Easterday* that the disclaimer was invalid. *Frederick W. Lowey*, 40 IBLA 381 (1979). RSC's motion for reconsideration and for a hearing was denied on September 11, 1979. RSC and its clients then filed these actions to compel the New Mexico BLM to issue the leases to them. The six cases were consolidated on February 28, 1980. On May 21, 1980, Eloise B. Miller, the second drawn offeror on plaintiff Ross' parcel, was granted leave to intervene as a defendant.

### Summary of Arguments

The parties' cross-motions for summary judgment are now before the court. Plaintiffs move, in the alternative, to remand the cases to the agency for a full evidentiary hearing. Plaintiffs argue (1) that this court must determine *de novo* the issue of the disclaimer's validity; (2) that the disclaimer was valid to eliminate RSC's interest in the offers; (3) that the IBLA's "retroactive application of its administrative adjudicative determinations regarding the validity of the disclaimer-waiver and the agreement (*i. e.,* *Easterday*) constitutes arbitrary and capricious agency action;" (4) that the IBLA denied plaintiffs due process by accepting late-filed affidavits of the three Wyoming BLM officials; and (5) that the government is estopped from holding the disclaimer invalid. Plaintiffs do not now contest the IBLA's ruling that the agency provision constituted an interest in violation of 43 C.F.R. § 3102.7 and § 3112.5–2.

### Discussion

1. *Standard of Review*

■ Defendants correctly point out that courts must defer to an agency's interpretation of its own governing statutes and

regulations unless "plainly erroneous or inconsistent with the regulation." *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965); *Montana Power Co. v. Environmental Protection Agency*, 608 F.2d 334, 344–45 (9th Cir. 1979). However, this rule does not apply where the agency's decision was based not on an interpretation of its regulations but on general common law principles. *Texas Gas Transmission Corp. v. Shell Oil Co.*, 363 U.S. 263, 80 S.Ct. 1122, 4 L.Ed.2d 1208 (1960); *Edwards v. Califano*, 619 F.2d 865, 869 (10th Cir. 1980) (*citing Jicarilla Apache Tribe v. Federal Energy Regulatory Commission*, 578 F.2d 289, 292–93 (10th Cir. 1978)). Here, the IBLA's ruling that RSC's disclaimer did not eliminate its interest was determined not from its interpretation of its own regulations nor on the basis of "specialized knowledge gained from experience" in its area of expertise, but rather "by the application of ordinary rules of contract construction." *Texas Gas, supra*, 363 U.S. at 268–69, 80 S.Ct. at 1125–26. Accordingly, we must determine *de novo* whether the IBLA's construction of the contract between the parties was the correct one.

2. *Validity of the Disclaimer*

■ The IBLA concluded, first, that RSC's disclaimer was not effective to eliminate its interest in any client's lease offer for which the service agreement was signed *after* the date of the disclaimer. We find this conclusion unassailable. The disclaimer states that Engle "*is* a party to various contracts" and that he waives any rights "which [he] may have by reason of said service agreements."[21] In addition to the disclaimer's plain language, it is well established that a release that purports to discharge future rights and claims not yet in existence is not operative to discharge any rights under a contract made subsequently to the release.

[A] manifested intention [to create an obligation that] is in conflict with the

---

**21.** A.R. at 201 (emphasis supplied).

words of the release . . . will prevail over it because later in time. . . . So, also, a contract that is entirely inconsistent with the terms of a previously executed release will prevail over that previous release and destroy its operation.

5A Corbin, Contracts § 1238, at 560 (1964). The exclusive agency provision of the subsequent service agreement was entirely inconsistent with the language of the earlier release. Only Gallagher's contract with RSC was in existence when the disclaimer was executed. The earlier disclaimer could not reach or eliminate RSC's interest in the other plaintiffs' offers.

Second, the IBLA ruled that, even if the disclaimer did apply to all the plaintiffs' service agreements whenever signed, it was nonetheless invalid because not mutually consented to or supported by consideration. Although authorities are split as to the requirements for an effective disclaimer of a contract right, the common law and majority rule hold a disclaimer valid only if given under seal or in exchange for consideration. Absent a seal or consideration, the disclaimer was ineffective unless the obliged party relied on it to his detriment.[22] Since RSC's disclaimer was not under seal, nor supported by consideration, nor communicated to RSC's clients until after a first place drawing, it did not eliminate its interest in its clients' lease offers. The Secretary thus was correct in disqualifying all of the plaintiffs, including Gallagher.

### 3. Retroactive Application of Agency Rules

Plaintiffs argue that the IBLA's *Easterday* decision reversed the BLM's previous acceptance of RSC's disclaimer, and that such "retroactive" application of a "new rule" was arbitrary and capricious. We do not agree. RSC was notified as early as December 1976 that its service agreement did not comply with the Department's regulations. RSC persuaded the Wyoming BLM to accept its disclaimer until a new service agreement could be drafted. The issue is not whether a "new rule" was retroactively applied, but whether the Secretary is estopped from declaring the disclaimer invalid. This issue is discussed *infra*.

### 4. Admission of Late Filed Affidavits

█ Plaintiffs assert that the IBLA's acceptance of three affidavits by BLM officials after the date for final briefing had passed denied them due process of law.[23] We find this argument unpersuasive. RSC itself submitted three affidavits to the IBLA—two by Engle and one by Theuerkauf—in which it presented its own version of the facts.[24] RSC did not attempt to submit further sworn statements to rebut the BLM officials' affidavits. We find the IBLA's admission of the affidavits into evidence to be neither arbitrary and capricious nor in violation of plaintiffs' due process rights.

### 5. Estoppel

█ Plaintiffs argue, finally, that the Wyoming BLM officials' acceptance of RSC's waiver estops the Secretary from denying its validity and disqualifying plaintiffs. The traditional and often repeated rule that the government is not subject to estoppel has been somewhat modified by courts in recent years. Modern authorities

**22.** Restatement (Second) of Contracts § 343 (Tent. Draft No. 13, 1978); 15 Williston, Contracts §§ 1820, 1822 (1972). Professor Williston notes that, "In a *few* jurisdictions, statutes have . . . giv[en] an unsealed release in writing the effect which the common law gave to sealed writings only." *Id.* at § 1822 (emphasis supplied).

**23.** On February 5, 1979, Administrative Law Judge Steubing granted plaintiffs an opportunity to respond to the government's brief and stated that that response would conclude the briefing. On March 7, 1979, however, the government submitted affidavits by two of the Wyoming BLM officials involved, and on March 30, 1979, it submitted an affidavit by the third official. His affidavit was not filed with the others because he had been hospitalized at the time. Plaintiffs' objection to the IBLA's admission of these affidavits was rejected. Appendix 9 to Plaintiffs' Motion for Summary Judgment, at 1–2; Appendix 10; *Frederick W. Lowey,* 40 IBLA at 393 n. 9.

**24.** A.R. at 41–43, 210–14.

indicate that estoppel may be invoked where (1) the traditional requirements are met,[25] and (2) the government's actions constitute "affirmative misconduct." *United States v. Ruby Co.*, 588 F.2d 697 (9th Cir. 1978), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); *Santiago v. Immigration & Naturalization Service*, 526 F.2d 488 (9th Cir. 1975), *cert. denied*, 425 U.S. 971, 96 S.Ct. 2167, 48 L.Ed.2d 794 (1976). *Cf. United States Immigration & Naturalization Service v. Hibi*, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973) (implying that affirmative misconduct might give rise to estoppel against the government).

The BLM officials' actions do not approach the requisite level of "affirmative misconduct." Although the officials erred in agreeing to accept RSC's disclaimer, they did so at RSC's request and to protect RSC's clients until RSC could put a revised service agreement into effect. Further, it would be a misstatement to assert that RSC is without blame. It had notice as early as December of 1976 that its exclusive agency provision was improper and was in clear violation of the regulations, yet it refused to change its service agreement for fifteen months. RSC could have entered new service agreements with its existing clients but declined to do so. Plaintiffs have no entitlement to the leases for which they submitted offers, but a mere hope or expectation. *Schraier v. Hickel*, 419 F.2d 663, 666 (D.C.Cir.1969); *McDade v. Morton*, 353 F.Supp. 1006, 1010 (D.D.C.1973), *aff'd*, 494 F.2d 1156 (D.C.Cir.1974). Against these considerations we must balance[26] the public interest in fair administration of the noncompetitive lease program. All offerors are entitled to assurance that the government will impartially enforce its regulations. Plaintiffs' claim of governmental estoppel is without merit.

**25.** (1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the

*Conclusion*

For the above reasons, we conclude that the Secretary was amply justified in disqualifying plaintiffs' offers to lease. Summary judgment for defendants therefore is appropriate. An order consistent with the foregoing has been entered this day.

former's conduct to his injury. *United States v. Wharton*, 514 F.2d 406, 412 (9th Cir. 1975). It is clear that plaintiffs do not begin to meet these requirements.

**26.** *United States v. Ruby Co., supra*, at 703.