684 F.2d 957
 221 U.S.App.D.C. 435
 Frederick W. LOWEY, and Fred L. Engle d/b/a Resource Service
Company, et al., Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
John A. GALLAGHER, and Fred L. Engle d/b/a Resource Service
Company, Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
J. E. HAM, and Fred L. Engle d/b/a Resource Service Company, Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
Dr. Heinz LICHTENSTEIN and Ursula Lichtenstein, and Fred L.
Engle d/b/a Resource Service Company, Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
James M. ROSS, and Fred L. Engle d/b/a Resource Service
Company, Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
Richard K. VITEK, and Fred L. Engle d/b/a Resource Service
Company, Appellants
v.
James G. WATT, Secretary, United States Department of the
Interior, et al.
 Nos. 81-1847 to 81-1852.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 30, 1982.
Decided July 2, 1982.
 
 Appeals from the United States District Court for the District of Columbia (D.C. Civil Actions Nos. 79-03314, 79-03315, 79-03316, 79-03317, 79-03318, and 79-03319).
 Wayne E. Babler, Jr., Milwaukee, Wis., with whom Thomas W. Ehrmann, Milwaukee, Wis., was on the brief for appellants.
 Jacques B. Gelin, Atty., Dept. of Justice, Washington, D. C., with whom Robert D. Clark, Atty., Dept. of Justice, Washington, D. C., was on the brief, for appellees James G. Watt, Secretary of the Interior, et al.
 Jason R. Warran, Washington, D. C., with whom James W. McDade, Washington, D. C., was on the brief, for appellee Eloise B. Miller.
 Before WRIGHT and WILKEY, Circuit Judges, and CELEBREZZE,* Senior Circuit Judge.
 Opinion for the court filed by Circuit Judge J. SKELLY WRIGHT.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 These cases require us to settle the rights to six federal oil and gas leases, in accordance with the federal common law of contracts and the Mineral Leasing Act of 1920. Appellants are seven private individuals and a "filing service" called Resource Service Company (RSC). The individual appellants and RSC all signed standard agreements, prepared by RSC, under which RSC was to file applications for "noncompetitive" federal leases on behalf of the individual appellants. RSC's standard agreement forms, it turned out, contained a provision of doubtful legality under the applicable Interior Department regulations; if the provision did in fact violate the regulations, no application filed by RSC would be valid. RSC anticipated filing thousands of applications on behalf of all of its clients between the time questions were first raised about its contract provision and the time the Interior Board of Land Appeals (IBLA) reached a final decision on the legality of the provision. Therefore, the president of RSC attempted to make certain that any applications it filed would be valid, notwithstanding the questionable provision. He executed unilaterally a blanket waiver of the offensive provision-which benefitted RSC exclusively-and he filed the waiver with the state Bureau of Land Management (BLM) offices that administer the federal leasing program.
 
 
 2
 The IBLA did finally decide that the provision in RSC's standard contracts violated Interior Department regulations. Then, in a second set of administrative adjudications, the IBLA held that RSC's unilateral waiver did not cure the defect in the standard contracts. It therefore rejected applications to lease lands in New Mexico filed by the individual appellants in these cases, all of whose offers would have been accepted if the waiver were effective. Appellants sought review of the IBLA's decision in the District Court, 517 F.Supp. 137, which granted summary judgment against them. Both the IBLA and the District Court relied entirely on the common law of contracts, holding that the waiver was ineffective because it was not made under seal, supported by consideration, or communicated promptly to RSC's clients.
 
 
 3
 We reverse. The unilateral waiver procedure, which RSC had worked out with BLM officials, was a reasonable response to the legal uncertainties surrounding RSC's standard contracts. With a great deal of ad hoc formality and guarantees that RSC would abide by the waiver, it accomplished the clear mutual purpose of both RSC and its clients, ensuring that the applications RSC filed were not invalid. The procedure was fair, not only to RSC and its clients, but also to other applicants for the federal leases at issue. Therefore, we hold that RSC's waiver effectively removed the offensive provision from its standard contracts. The Interior Department remains free to enact new regulations or interpret existing regulations prospectively so as to require extra procedures for removing illegal provisions from standard leasing service contracts, but it erred in supposing that RSC's waiver was ineffective as a matter of common law.
 
 
 4
 * The facts of these cases are more complicated than the legal questions upon which our resolution of the cases turn. Although the cases before us involve only oil and gas leases for federal lands in New Mexico, much of the background concerns RSC-filed applications for leases in Wyoming as well.
 
 A. The Noncompetitive Leasing Program
 
 5
 Under the Mineral Leasing Act of 1920, the Interior Department was authorized to award oil and gas leases for lands not "within any known geological structure of a producing oil or gas field" without competitive bidding to "the person first making application for the lease who is qualified to hold a lease."[1] For many years the Department has followed a procedure of posting notices of parcels available for noncompetitive leasing in the BLM office for the state in which the lands are located, together with a deadline for filing applications to lease. All applications filed before the deadline are deemed to have been filed simultaneously, and the BLM office holds a drawing early in each month to award the leases.[2] Three applications are drawn for each parcel. If the person filing the first-drawn application qualifies to hold the lease, the lease is awarded to that person; if not, it is awarded to the second-drawn applicant, and so forth.
 
 
 6
 In effect, this procedure creates a lottery for awarding leases. The program is understandably popular. Many of the parcels contain oil or gas in commercial quantities, even though they fall outside of known oil or gas fields. The person to whom a lease is awarded is often able to assign it to an oil company for substantial payments and royalties, depending on the likelihood that the leased parcel contains oil or gas.
 
 
 7
 All applications for leases must be filed on a standard "drawing entry card," and the applicant does not qualify to hold a lease unless the application comports with Interior Department regulations. Two of those regulations are pertinent to these cases. First, a "sole party in interest" regulation requires the person or persons submitting an application to identify on the face of the drawing entry card all parties having an "interest" in the application. 43 C.F.R. § 3102.7 (1981). An "interest" includes any "claim * * * to an advantage or benefit from a lease * * * or any defined or undefined share in any increments, issues, or profits which may be derived from * * * the lease based upon or pursuant to any agreement or understanding existing at the time when the application or offer is filed." Id. § 3100.0-5. Second, a "multiple filing" regulation prohibits any "arrangement entered into prior to selection (drawing) which gives any party or parties more than a single opportunity of successfully obtaining a lease or interest therein." Id. § 3112.6-1(c). Failure to comply with either regulation disqualifies an application. Id. § 3112.6-1(b)-(c).
 
 B. Resource Service Company
 
 8
 RSC is one of a number of "filing services" that have emerged in connection with the noncompetitive leasing program. The filing services publicize the opportunities of the program and, for a fee, prepare and submit drawing entry cards on behalf of members of the public. They also select the parcels for which applications should be filed, keeping track of which parcels available for leasing are likely to have commercial value.[3]
 
 
 9
 From its organization in 1973 until March 1978, RSC used a set of standard service agreements in signing up clients. The agreements provided that, for each application RSC prepared on behalf of a client, the client would pay RSC $10 to cover the Interior Department's filing fee and a service fee to RSC of between $6 and $10, depending on the number of applications the client wished to file. Typically, the client would sign a certain number of drawing entry cards and prepay its fees to RSC; RSC would then select the parcels on which applications would be submitted, complete the card, and file it with the appropriate state BLM office on or before the deadline for applications for that parcel.
 
 
 10
 In addition, the standard service agreements granted RSC an exclusive right for five years to negotiate sales or assignments of any leases its clients actually won, and to receive a set percentage of the proceeds from a lease during its first five years of operation. The clients retained the right to disapprove any negotiated price or to withhold their leases from the market until the five-year period had expired. This additional clause became known as the "exclusive sales agency provision," and the marrow of these cases is RSC's attempt to disclaim it. It was apparently drafted by counsel in Milwaukee, Wisconsin, where RSC had its principal place of business, and appellees have not challenged RSC's assertion that it believed in good faith-albeit, as events developed, mistakenly-that the exclusive sales agency provision did not give RSC an "interest" in its clients' applications.
 
 
 11
 C. The "Amendment and Disclaimer"
 
 
 12
 For the first three years of its operations, RSC's service agreement went unchallenged. RSC submitted applications on behalf of its clients to state BLM offices in Wyoming, Colorado, and New Mexico. Occasionally, applications prepared by RSC were drawn first, and RSC clients were routinely awarded leases without protest.
 
 
 13
 In December 1976, however, an applicant for a lease in Wyoming whose card had been drawn second protested the award of the lease to the first-drawn applicant, an RSC client, on the ground that the exclusive sales agency provision gave RSC an interest in its client's application that had not been disclosed on the drawing entry card. RSC learned of the protest shortly after it was filed, and it faced an obvious dilemma. An initial ruling from the Wyoming BLM office might not come for months, and no matter how the office ruled its decision could be appealed to the IBLA and thereafter to the courts. Therefore, it might well be months, or even years, before RSC could know with certainty whether the exclusive sales agency provision created an "interest."[4]
 
 
 14
 In the meantime, state BLM offices were holding new drawings every month. If RSC continued to file applications on behalf of clients who had signed its standard agreement, it risked that all the applications would violate the sole party in interest regulation and, because RSC filed applications on behalf of more than one client for desirable leases, the multiple filing regulation. On the other hand, developing a new set of forms and getting all of its clients to sign new agreements would entail considerable delay and expense, and the process might not be completed in time for drawings in the upcoming months. In the end, that effort would be wasteful if the IBLA decided that the provision did not create an interest.
 
 
 15
 Accordingly, on January 13, 1977-before the Wyoming BLM office had reached an initial decision on the interest question-RSC's president executed a document which he titled an "Amendment and Disclaimer." Following a description of the uncertainty concerning RSC's standard service agreement and RSC's belief that it did not give RSC an interest in its clients' applications, the document stated:
 
 
 16
 NOW, THEREFORE, I, FRED ENGLE, d/b/a RESOURCE SERVICE COMPANY, do hereby state and aver that I do hereby waive and renounce any exclusive agency which I may have by reason of said service agreements with said offerors from and after this date.
 
 
 17
 I do hereby further state and aver that said waiver and renunciation shall become operative forthwith and shall inure forthwith for the benefit of all said offerors.
 
 
 18
 I do hereby further state and aver * * * that this disclaimer is being made in the event that a determination is made that the exclusive agency vests in me an interest in the lease or offer to lease which may disqualify the offeror.
 
 
 19
 * * * (I)n the event a determination is made following the exhaustion of all administrative remedies and judicial remedies that said exclusive agency does not constitute an interest * * * this Amendment and Disclaimer shall be null and void as if never executed.
 
 
 20
 Joint Appendix (JA) 48-49. The document was signed, witnessed, and notarized. One copy was sent to the Wyoming BLM office immediately; another was sent to the New Mexico BLM office by certified mail on March 29, 1977, see id. 77.
 
 
 21
 RSC also negotiated a set of procedures with the BLM office in Wyoming, where RSC filed the vast majority of its lease applications. RSC agreed that whenever one of its clients won a lease drawing, it would notify the client that the client was not bound by the exclusive sales agency provision. It would then ask the winning client to sign a new sales agency agreement.[5] Furthermore, RSC agreed to provide the BLM office with the names of any RSC clients who won drawings, so that the BLM could make certain that RSC had notified the client that the exclusive sales agency provision was not binding, and so that the BLM could discover whether RSC was using improper methods to get its winning clients to sign new agreements.[6]
 
 
 22
 RSC did not, however, inform all of its clients about its "Amendment and Disclaimer"-only those clients who won drawings, and then only after they had won. RSC also continued to use its old standard service agreement forms in signing up new clients. It did not begin using revised forms, without the exclusive sales agency provision, until after the IBLA had held that its old forms created an interest in RSC and the time for seeking judicial review of the IBLA's decision had expired.[7]
 
 D. The New Mexico Drawings
 
 23
 The seven individual appellants in these cases are all RSC clients for whom RSC submitted applications for noncompetitive leases on parcels in New Mexico. One of the seven had signed an RSC service agreement long before any doubts arose as to its validity. The others all became RSC clients during the period between the time RSC executed its "Amendment and Disclaimer" and the time when the IBLA's decision that the old forms were invalid became final.[8] Accordingly, all seven individual appellants signed service agreements with RSC that contained the exclusive sales agency provision, but none of them learned about the "Amendment and Disclaimer" until after their applications had been drawn.
 
 
 24
 The applications of James Ross and Richard Vitek were filed on November 25, 1977, roughly eight months after RSC filed its "Amendment and Disclaimer" with the New Mexico BLM office. Ross and Vitek were the first RSC clients to have their applications drawn in a New Mexico drawing; the other appellants' applications were submitted and drawn over the next four months.
 
 
 25
 Immediately after learning that the Vitek and Ross applications had been drawn, RSC sent a letter to the New Mexico BLM office describing the notification procedure it had successfully followed with the Wyoming BLM office and providing copies of all its correspondence with the Wyoming office on the matter. JA 54. RSC then followed the same procedure it had used with its clients in Wyoming. After each New Mexico drawing, it sent a letter to the appellant whose application had been drawn, stating in part:
 
 
 26
 To remove any doubt that our clients are in fact the exclusive owners of their leases and to protect their best interests we have informed the Bureau (BLM) that we do not consider this exclusive clause binding if it created an interest in us. The Bureau has suggested that if the Sales Agreement is signed after the drawing there is no question presented.
 
 
 27
 I am therefore enclosing two copies of our Sales Agreement which I would appreciate your signing and return(ing) one copy to me * * *. Please note that the Sales Agreement spells out the same terms as provided in the Service Agreement. We are confident that our past record of sales and our extensive contacts will enable us to put our best efforts to the sale of this lease to your profitable advantage. * * *
 
 
 28
 JA 75, 84, 89, 94, 99, 105 (emphasis in original). RSC also had its clients send a copy of this letter, the original service agreement they had signed, and any new sales agency agreement they signed to the New Mexico BLM office.
 
 
 29
 All of the individual appellants signed the new, post-drawing sales agency agreement. Ross, however, altered its terms so as to make RSC's sales agency non-exclusive, and RSC accepted the change. See id. at 95.
 
 
 30
 Second-drawn applicants in each of the New Mexico drawings-including appellee Eloise B. Miller, whose application for one parcel was drawn second to Ross'-filed protests to block award of any of the leases to RSC clients. Between March 13 and March 23, 1978 the New Mexico BLM office issued rulings rejecting the applications to lease filed on behalf of six of the individual appellants, and on June 8 it rejected the seventh individual appellant's application.[9]
 
 E. The IBLA and District Court Decisions
 
 31
 The RSC clients whose first-drawn applications had been rejected by the New Mexico BLM office appealed that decision to the IBLA. Fourteen months later, in May 1979, the IBLA handed down the decision on review in these cases. Frederick W. Lowey, 40 IBLA 381 (1979). The IBLA, unlike the New Mexico office, took account of the fact that RSC had filed the "Amendment and Disclaimer" in New Mexico long before submitting the lease applications at issue. Id. at 384. Nevertheless, the IBLA held that the "Amendment and Disclaimer" was ineffective as a matter of common law, because there was no consideration to RSC for relinquishing its rights under the exclusive sales agency provision, and because RSC had failed to provide notice of the waiver to appellants until after the drawings. Id. at 387-393.[10] In addition, the IBLA held that the parol evidence rule precluded even considering the effectiveness of the "Amendment and Disclaimer" as to any service agreements signed after the date it was executed, i.e., as to all of the individual appellants in these cases except John Gallagher.[11]
 
 
 32
 The losing parties in Lowey and RSC sought review of the IBLA's decision in the District Court for the District of Columbia, which granted summary judgment affirming the IBLA. The District Court held, first, that a de novo construction of the service agreements and the "Amendment and Disclaimer" was required, without deference to the IBLA's ruling, because the IBLA's ruling "was determined not from its interpretation of its own regulations nor on the basis of 'specialized knowledge gained from experience' in its area of (regulatory) expertise, but rather 'by the application of ordinary rules of contract construction.' " Lowey v. Watt, 517 F.Supp. 137, 142 (D.D.C.1981) (JA 9) (citing Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 268-269, 80 S.Ct. 1122, 1125-26, 4 L.Ed.2d 1208 (1960)). The District Court then reached the same conclusion that the IBLA had reached. It held that the "Amendment and Disclaimer" could not alter the obligations in any service agreements signed after it was executed and that, in any event, "the common law and majority rule hold a disclaimer valid only if given under seal or in exchange for consideration." Id. at 142-143. Although the "Amendment and Disclaimer" might also have been valid had appellants relied on it, the District Court found that reliance was precluded by the fact that they did not learn of the document until after the drawings. See id. at 143. The District Court also rejected appellants' arguments that the government was estopped to deny the effectiveness of the "Amendment and Disclaimer" by the actions of the Wyoming BLM office and that the government could not apply its decision retroactively to applications filed before it announced that it would require waivers of contract provisions to be made with consideration or under seal. See id. at 143-144.
 
 II
 
 33
 Two preliminary considerations require brief discussion before we proceed to the principal issue on appeal. The first is the standard of review. The District Court was correct in holding that no deference is due an administrative decision that rests solely on principles of law unrelated to the statutes or regulations that the agency regularly interprets. Where an agency decision is explicitly based on principles of contract interpretation "as announced by the courts," a reviewing court must make an independent determination of the governing principles. Texas Gas Transmission Corp. v. Shell Oil Co., 363 U.S. 263, 270, 80 S.Ct. 1122, 1126, 4 L.Ed.2d 1208 (1960); cf. Cleveland Cliffs Iron Co. v. ICC, 664 F.2d 568, 591-592 (6th Cir. 1981) (implying that the ICC could not undertake the "purely judicial task" of determining the validity and effect of contracts). For the same reason, the Court of Appeals is bound to make its own assessment of legal principles, without the deference we accord District Court rulings that involve questions of fact. Texas Gas Transmission, supra, 363 U.S. at 270, 80 S.Ct. at 1126; see Winkler v. Andrus, 594 F.2d 775 (10th Cir. 1979).
 
 
 34
 Second, neither the District Court, nor the IBLA, nor any of the parties, has identified what law provides the standards by which the effectiveness of RSC's "Amendment and Disclaimer" should be judged. All seem to assume, without making the assumption explicit, that the question before us is governed by federal law. That assumption is correct. Although federal law does not govern all questions of contract interpretation involving leases issued under the Mineral Leasing Act of 1920, see Wallis v. Pan American Petroleum Corp., 384 U.S. 63, 86 S.Ct. 1301, 16 L.Ed.2d 369 (1966), it applies to questions with significant implications for federal policy and which require uniform resolution throughout the federal system. See Wallis, supra, 384 U.S. at 67-69, 86 S.Ct. at 1303-04; Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838 (1943).
 
 
 35
 The precise question raised is whether the Interior Department erred in rejecting the individual appellants' offers to lease, after their application cards were drawn, on the ground that RSC's "Amendment and Disclaimer" was ineffective. Were state law to govern that question, it would "lead to great diversity in results by making identical transactions subject to the vagaries of the laws of the several states," and it would "subject the rights and duties of the United States to exceptional uncertainty." Clearfield Trust, supra, 318 U.S. at 367, 63 S.Ct. at 575. Uncertainty concerning RSC's standard service agreement and the effectiveness of its waiver affects the rights to lease approximately 70 parcels of federal land. If the law to be applied were that of the state in which the lands are located, a single applicant might find that he or she had filed a valid application in one state and an invalid application in another, although except for the number of the parcel the applications would be identical.[12] If, on the other hand, the law to be applied were that of the state in which a service agreement was signed, one state BLM office would be forced to assess the laws of many distant states to settle the rights from a single drawing.
 
 
 36
 Wallis was a diversity case, a contract dispute between two private parties of no concern to the federal government except for the fact that their dispute involved a federal lease. These cases, in contrast, arise on petitions for review of administrative decisions; the duties of federal officials in administering the noncompetitive leasing program are directly in issue. In such cases state law may be instructive, useful, and even compelling, so long as it does not conflict with the applicable federal policies. See Commissioner v. Estate of Bosch, 387 U.S. 456, 465, 87 S.Ct. 1776, 1782, 18 L.Ed.2d 886 (1967). But we are not under the same obligation as in diversity cases to search out and follow relevant state precedents. See generally P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 762-770 (2d ed. 1973). Our disposition of this case must take account, as no state's contract law can, of the statutory policies that control the noncompetitive leasing system. See Part III-A infra; D'Oench, Duhme & Co., Inc. v. FDIC, 315 U.S. 447, 472-475, 62 S.Ct. 676, 686-88, 86 L.Ed. 956 (Jackson, J., concurring).
 
 
 37
 In sum, the decision to accept or reject applications for noncompetitive leases is a federal decision, which the Interior Department (through the BLM and the IBLA) administers uniformly throughout the nation, and for which Congress has provided uniform federal court review by means of the federal question statute and the Administrative Procedure Act. Questions of contract law affecting that decision should also have a uniform resolution in accordance with federal policies.
 
 III
 
 38
 In January 1977, faced with the possibility of an imminent ruling by the BLM that would effectively prevent it from doing business, RSC took what seemed reasonable steps to protect its clients and itself. It formally stated its intent not to enforce the possibly illegal exclusive sales agency provision and delivered a document to that effect into the hands of the BLM, which had both motive and ability to make certain that RSC abided by its promise. The unilateral method RSC chose had the twin virtues of speed-a crucial factor, since the January and February 1977 drawings were about to occur-and inexpensiveness. If the law considers RSC's actions a legal nullity, there must be some good reason for it.[13] We conclude that, in the context of the noncompetitive leasing program, RSC's "Amendment and Disclaimer" was effective to waive the offensive provision in its service agreements, thus curing the possible defect in its clients' applications before they were ever filed.
 
 
 39
 A. Policies of the Noncompetitive Leasing Program
 
 
 40
 The IBLA and the District Court relied solely on the common law of contracts in holding that RSC's "Amendment and Disclaimer" was ineffective. Whatever our view of contract law, however, we would not accept what RSC did if it were inconsistent with the regulations or the policies governing the noncompetitive leasing program. Yet, as the IBLA and the District Court implicitly recognized, the program's regulations do not prescribe any particular method for waiving impermissible interests before applications are filed, and we find that RSC's actions were not inconsistent with the policies of the program.
 
 
 41
 The noncompetitive leasing program is open to all-any citizen can stand on an equal footing with large oil companies in seeking to take advantage of its benefits. Thus an overarching policy of fairness is intrinsic to the program. At the same time, administering such an egalitarian program can be difficult, and the Interior Department has broad discretion to frame per se rules, even if they may produce harsh results, to simplify its administrative task. See Brick v. Andrus, 628 F.2d 213, 216 (D.C.Cir.1980); Dawson v. Andrus, 612 F.2d 1280 (10th Cir. 1980). But where innocent applicants could not have had notice of a supposed per se rule before their applications were rejected, the courts have not allowed administrative convenience to obscure considerations of fairness. See, e.g., McDonald v. Watt, 653 F.2d 1035 (5th Cir. 1981); Brick v. Andrus, supra; Winkler v. Andrus, supra.
 
 
 42
 Most people who want to file applications for noncompetitive leases have little choice but to employ a filing service to scout the best opportunities, and to rely on the filing service to make sure that the applications conform to Interior Department regulations. If we were to hold, as a matter of common law, that a filing service's reasonable efforts to cure a defect in its contracts with its clients were insufficient, our decision would not only penalize blameless individuals like the individual appellants in these cases, but it would have a deleterious effect on the program as a whole. Private individuals would doubt the fairness of the program, and they might become wary of seeking to take advantage of it. And filing services would be forced to take expensive precautions that would only, in the end, require them to raise their fees, thus putting the program out of the reach of individuals of modest means. Not only would that tend to limit the pool of potential applicants to the wealthy and sophisticated, but it would also reduce the income that the government earns from the filing fee it charges for each application.[14] See R. M. Barton (I), 4 IBLA 230, 234 (1972) (Thompson, ALJ, concurring).
 
 
 43
 Nor is it unfair to appellee Miller and others whose applications were drawn second to hold that RSC could waive the exclusive sales agency provision in the manner it chose. All qualified applicants who have submitted drawing entry cards that comply with Interior Department regulations should have an equal chance to obtain a lease. If an application is not in compliance with the regulations when it is filed, then the applicant has no right to participate in the drawing and no right to a lease if his or her application is drawn first. But if an application is valid when filed and drawn, no matter what the applicant had to do to make the application valid, then the rules of the game dictate that the lease must be awarded to the applicant whose card was drawn first. See Udall v. Tallman, 380 U.S. 1, 4, 85 S.Ct. 792, 795, 13 L.Ed.2d 616 (1965). If RSC effectively waived its interest before submitting any applications on behalf of its clients, then their applications were just as valid as the applications submitted by anyone else, and all had a fair chance to be the first one drawn.
 
 B. Lack of Consideration or Notice
 
 44
 Both the IBLA and the District Court held that RSC's "Amendment and Disclaimer" was ineffective because it was not made for consideration, under seal, or with notice. On appeal the parties before this court rely on general rules which seem to contradict one another. Appellants cite a line of cases from various jurisdictions holding that waiver is essentially unilateral in character and that any intentional waiver of rights acquired by contract is effective.[15] They argue on that basis that RSC's "Amendment and Disclaimer" was effective to waive the exclusive sales agency provision because it was "knowing and intelligent," and that nothing more should be required. Appellees, defending the result below, counter with a supposed "majority rule" that a waiver of contract rights is not effective unless made for consideration or under seal, or unless it induces reliance in the other party to the contract.[16] Neither rule is as generally applicable as its proponents claim, but we find that these cases fit within the narrow category of cases in which neither consideration nor notice is required to make a unilateral waiver of contract rights valid.
 
 
 45
 In the type of situation presented by these cases, appellees' broad "majority rule" is rejected by the Restatement (Second) of Contracts and the Uniform Commercial Code. Both sources permit modification of contractual duties without consideration in the context of adjustments to an ongoing business relationship. Under the topic "Contracts Without Consideration," the Second Restatement provides:
 
 
 46
 A promise modifying a duty under a contract not fully performed on either side is binding
 
 
 47
 (a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made * * *.
 
 
 48
 Restatement (Second) of Contracts § 89 (1981);[17] cf. U.C.C. § 2-209(1) (agreement modifying a sales contract needs no consideration). Since the service agreement between RSC and its clients had not been fully performed by either side, the effectiveness of the "Amendment and Disclaimer" is governed not by the presence or absence of consideration, but by Section 89's "fair and equitable" standard.
 
 
 49
 Comment b to Section 89 explains that the "fair and equitable" standard in subsection (a) requires not only absence of coercion but also "an objectively demonstrable reason for seeking a modification." Other factors to be considered include the relative financial strengths of the parties, the formality with which the modification is made, and the extent to which the new promise is performed. 1 Restatement (Second) of Contracts § 89, comment b, at 238 (1981). The main purpose of this inquiry is to distinguish between situations in which the parties to an existing contract attempt to cope with unforeseen difficulties, the risk of which was not allocated in the original agreement, and situations in which one party "holds up" the other for increased compensation. See Angel v. Murray, 113 R.I. 482, 322 A.2d 630, 634-636 (1974) (explaining draft version of Section 89); cf. Lange v. United States, 120 F.2d 886 (4th Cir. 1941); Linz v. Schuck, 106 Md. 220, 67 A. 286 (1907) (cases reaching similar results before Second Restatement).
 
 
 50
 The situation that RSC confronted in January 1977 is closely analogous to the situations for which Section 89 was framed. In entering into the original service agreements, neither RSC nor its clients anticipated that the exclusive sales agency provision would frustrate the unmistakable overall purpose of the agreement-filing valid applications for noncompetitive leases. The "Amendment and Disclaimer" was both drafted and executed by RSC, the party with superior financial position, so that there is no reason to suspect that RSC was somehow improperly coerced into relinquishing its rights. The ad hoc formality employed-witnessing and notarization of the document, and delivery of it to the BLM-provides substantial evidence that RSC considered the seriousness of its actions and intended to be bound by them. It is impossible to presume that RSC placed its "Amendment and Disclaimer" in the hands of government officials, with whom it dealt on a regular basis, in the expectation that it could renege on its promise without suffering serious consequences. Furthermore, the record shows that RSC in fact scrupulously abided by its waiver and the rest of its agreement with the Wyoming BLM office, not only in these cases but in approximately 60 other cases.
 
 
 51
 These cases do not come precisely within the rule of Section 89, but the reasons why they do not come within Section 89 reinforce rather than undermine our conclusion that consideration was not required. Section 89 requires that the parties to an ongoing business relationship not have allocated the risk of unforeseen events between them prior to the occurrence of the event that leads to a modification of their agreements. Cf. Transatlantic Financing Corp. v. United States, 363 F.2d 312 (D.C.Cir.1966) (company cannot claim that unanticipated events made performance under original contract impracticable where the contract allocated risk from those events to the company). Under its service agreement, RSC clearly bore the responsibility of making sure that the applications it prepared on behalf of its clients complied with Interior Department regulations. Not only was RSC in a far better position than its clients to inform itself about the regulations, but its promotional literature expressly promised to "take( ) care of everything" concerning compliance with the regulations, JA 119. Moreover, if the BLM had held RSC-prepared applications invalid because of the service agreement, the law would have given its clients a remedy against RSC for damages.
 
 
 52
 Where the illegality of a bargain is due to * * * statutory or executive regulations of a minor character relating to a particular business which are unknown to one party, who is justified in assuming special knowledge by the other party of the requirements of the law, the illegality does not preclude recovery by the ignorant party of compensation for any performance rendered while he is still justifiably ignorant, or for losses incurred or gains prevented by non-performance of the bargain.
 
 
 53
 Restatement of Contracts § 599 (1932); see 6A A. Corbin, Contracts § 1539 (1962 ed.); cf. Falls Lumber Co. v. Heman, 114 Ohio App. 262, 181 N.E.2d 713 (1961) (agent holding itself out as skilled in supervising all phases of construction loans was responsible to principal when it allowed cost of construction to exceed funds available).[18]
 
 
 54
 RSC, however, did not go as far as Section 89 would have permitted it to go if the risk of invalidation by the Interior Department had not been allocated to RSC in the original agreements. Section 89 permits "modification" of other party's contract rights in the face of unforeseen events. If one party alone bears the risk of loss, "modifying" the other party's rights without new consideration would be inappropriate, because it would give the party facing a loss leeway to coerce a blameless promisee into sharing that loss. But the party who bears the risk of loss may waive its own rights without affecting the other party's rights. Cf. U.C.C. § 2-209(4) (legally insufficient attempt at modification may constitute a waiver). In fact, the law does not permit a party who knows that a bargain is illegal to exact compensation for waiving its rights under the illegal portion of the bargain. See 6A A. Corbin, Contracts § 1529 at 793 (1962 ed.).
 
 
 55
 The rule urged by appellants, that intentional waivers do not require consideration, applies in this context even if it does not apply generally. When one party assumes the risk that its contract with another will be found to violate rules of an administrative character, it may waive offensive provisions that inure solely to its benefit without further consideration from the other party, in order to accomplish the essential purpose of the original contract. Courts will examine the waiver only to determine if there are sufficient indications of intent and fairness to ensure that waiver was what the parties intended, and not renunciation of the entire contract. On that standard, it is clear that RSC's waiver was not invalid for lack of consideration.
 
 
 56
 Nor was immediate notice to RSC's clients required to make the "Amendment and Disclaimer" an effective waiver. Notice has two functions: it may cause the party receiving notice to rely on the communication, and it may help prove that there was a "meeting of the minds" between the parties so as to form an enforceable agreement. The first function is not relevant to the cases at hand, because if consideration was not required, neither was reliance. The factors that make RSC's waiver valid without consideration apply as well to the substitutes for classical consideration, reliance and the seal. As to the "meeting of the minds," the requisite agreement was provided when RSC and its clients contracted to have RSC file valid applications for noncompetitive oil and gas leases. The positions of the parties and the context provided by law implied that RSC would give up part of its consideration if that were required to make the applications valid, or pay damages if the applications were invalid through some fault of RSC. No further agreement was required for RSC to live up to its side of the bargain.[19]
 
 C. Parol Evidence Rule
 
 57
 Finally, appellees contend that the "Amendment and Disclaimer" could not be effective to waive the exclusive sales agency provision in any agreements signed after the date on which the document was executed. Under the parol evidence rule, "A binding integrated agreement discharges prior agreements to the extent that it is inconsistent with them." Restatement (Second) of Contracts § 213(1) (1981). However, it is always a preliminary question whether the parties intended that the later agreements be "integrated," and in making that determination a court may consult "all relevant evidence," see id. at comment b, including documents that predate the later agreement, see id. § 214. See 15 S. Williston, Contracts § 1826 at 486-487 (3d ed. W. Jaeger 1972) (extent to which later agreement rescinds earlier inconsistent promises is always a question of intent and interpretation); U.C.C. § 2-208(1) (repeated performance of inconsistent promises may explain or modify an agreement). Insofar as possible, the agreement must be interpreted to effectuate the principal purpose of the parties and to harmonize the parties' statements of intent. See Restatement (Second) of Contracts § 202(1), (5) (1981).
 
 
 58
 Against this background, it smacks of absurdity to suggest that RSC and its clients intended agreements signed after the "Amendment and Disclaimer" to supplant it. First, that would imply that the "agreement" was an agreement to do nothing, since not only was the exclusive sales agency provision unlawful (and therefore unenforceable), but the BLM had been alerted to it and would make certain it was not enforced. Second, with respect to standardized agreements the law holds that no term is part of an agreement if the party who prepared the form has reason to believe that the other party would not have assented if it knew the form contained that term. See Restatement (Second) of Contracts § 211(3) (1981). RSC certainly had reason to believe that its prospective clients would not sign an agreement if they knew it contained a term that would render it impossible to accomplish the clients' purpose in signing the agreement. For its part, RSC conclusively demonstrated that it did not regard the later agreements as integrated. It scrupulously notified the BLM whenever applications filed on behalf of clients who signed later agreements were drawn first or second in a drawing, and it informed the clients that they were not bound by the exclusive sales agency provision.
 
 
 59
 In sum, it would be artificial to interpret the service agreements signed after the date of the "Amendment and Disclaimer" as integrated agreements superseding RSC's waiver. The parol evidence rule does not require us to disregard the "Amendment and Disclaimer" in considering whether RSC had waived its interest in the individual appellants' applications before they were filed.
 
 
 60
 For all of the foregoing reasons, we hold that RSC's "Amendment and Disclaimer" was effective as a matter of common law to waive the exclusive sales agency provision in the standard service agreements that appellants in these cases signed. The Interior Department erred in rejecting the individual appellants' offers to lease on the ground that their applications had failed to disclose all parties with an interest in the applications, because RSC had no interest in any of its clients' applications after it executed the "Amendment and Disclaimer."
 
 IV
 
 61
 We have decided the basic question in these cases as it was framed by the IBLA and the District Court. Neither suggested that the Mineral Leasing Act of 1920 or any of the Interior Department's regulations governing the noncompetitive leasing program created special requirements for waiving illegal contract provisions. Nor did either point to instances in the past where the Department has required more than the common law does for parties to waive their rights under a contract. Thus there was no positive statement of law or established practice to put appellants on notice that RSC could not, in the situation it confronted, waive its exclusive sales agency without more formality than it used. See Brick v. Andrus, supra, 628 F.2d at 216-217; Dawson v. Andrus, supra, 612 F.2d at 1283.
 
 
 62
 Our holding in these cases does not preclude the Department from establishing such requirements as consideration, seal, or prompt notice to all affected clients, either as an exercise of its rulemaking powers or by adjudication on the basis of existing statutes and regulations. That possibility, however, cannot alter our disposition of these cases. Under the principles in McDonald v. Watt, supra, 653 F.2d at 1042-1046, and Runnells v. Andrus, 484 F.Supp. 1234 (D. Utah 1980), the Department could not apply its new requirements to applications filed before the requirements were announced. Before the IBLA's opinion in Alfred L. Easterday appeared, see note 10 supra, appellants could not have known that the Department considered RSC's waiver ineffective, and even after Easterday the Department only stated that it thought the waiver ineffective as a matter of common law. Assuming that, at this late date, the Department could find some authority in its statutes or regulations for a rule more stringent than the common law, retroactive application of that rule would not advance any statutory policy sufficient to overcome the prejudice to the individual appellants in these cases, who "believed in good faith that they were complying with (the) letter (of the regulations) as that letter had been spelled out in previous decisions and in the practice of the BLM." See McDonald v. Watt, supra, 653 F.2d at 1045-1046.
 
 
 63
 Accordingly, the judgment of the District Court is
 
 
 64
 Reversed.
 
 
 
 *
 Of the Sixth Circuit, sitting by designation pursuant to 28 U.S.C. § 294(d) (1976)
 
 
 [1]
 30 U.S.C. § 226(c) (1976) (the statutory language was amended somewhat in 1981, see Pub.L.No.97-78, 95 Stat. 1070 (1981)). Persons awarded noncompetitive leases must pay the government a rental fee of $1.00/acre as well as a royalty of 12.5% on any oil or gas removed from the leasehold. See id.; 43 C.F.R. § 3103.3-2(a) (1981). The term of noncompetitive leases is five years, renewable for another five years at the option of the leaseholder. Thereafter the lease may be renewed only if oil or gas is being produced in commercial quantities. See 43 C.F.R. § 3107.1-3 (1981)
 
 
 [2]
 This court determined that the procedure followed comports with the statutory authority for the noncompetitive leasing program in Thor-Westcliffe Development, Inc. v. Udall, 314 F.2d 257 (D.C.Cir.), cert. denied, 373 U.S. 951, 83 S.Ct. 1681, 10 L.Ed.2d 706 (1963). See also McKay v. Wahlenmaier, 226 F.2d 35 (D.C.Cir.1955)
 
 
 [3]
 Filing services have been a familiar part of the noncompetitive leasing program for years, see, e.g., Robertson v. Udall, 349 F.2d 195 (D.C.Cir.1965), and to a large extent they are a necessary adjunct to the program. They make it possible for people like the individual appellants in these cases to participate on an equal footing with large oil companies. Without filing services, only wealthy individuals or corporations could afford the time and expense involved in learning which parcels in which states are available for leasing, and which of these parcels have the best chance of containing oil or gas. They therefore greatly expand the pool of potential applicants. See R. M. Barton (I), 4 IBLA 230, 234 (1972) (Thompson, ALJ, concurring)
 
 
 [4]
 In fact, the Wyoming office of the BLM did not sustain the protests filed against the RSC clients until March 1977. The IBLA subsequently affirmed the initial decision of the Wyoming office not to issue leases to the RSC clients whose applications had been challenged. Sidney H. Schreter, 32 IBLA 148 (1977); Lola I. Doe, 31 IBLA 394 (1977). These decisions held that RSC's standard service agreements created an interest in RSC as defined by 43 C.F.R. § 3100.0-5, and thus that any applications prepared by RSC that did not disclose the interest violated the sole party in interest regulation. Furthermore, if RSC filed applications on behalf of more than one client for any particular parcel, the multiple filing regulation would also be violated. The Doe and Schreter decisions were announced by the IBLA in September 1977. RSC and its clients had 90 days to seek judicial review of the decisions, but they ultimately declined to do so. When the time for seeking judicial review of the Doe and Schreter decisions expired, RSC began the process of drafting new standard service agreement forms, without the exclusive sales agency provision. See note 7 infra
 
 
 [5]
 Under applicable Interior Department precedents, exclusive sales agency agreements between filing services and their clients were permitted as long as they were arranged after the client's application had been drawn. The sole party in interest and multiple filing regulations demand only that there be no such agreement in effect at the time the application is filed and drawn. See John V. Steffans, 74 I.D. 46 (1967)
 
 
 [6]
 Both the "Amendment and Disclaimer" and the notification procedures were the result of negotiations between RSC and John Erdmann, a legal assistant working in the Wyoming BLM office. The arrangements were later approved by Erdmann's superiors, see JA 34, 36-37, although Erdmann warned RSC that any decisions they made might be protested and appealed to the IBLA, see id. at 40. Over the next 18 months, before RSC was able to replace its old forms with new forms, over 50 RSC clients won drawings conducted by the Wyoming BLM office. Both RSC and the BLM abided by the procedure they had worked out, and the Wyoming BLM office rejected all protests filed against RSC clients. See id. at 40, 55-71
 
 
 [7]
 After the period for seeking review of the IBLA's Doe and Schreter decisions had expired, the Wyoming BLM informed RSC that it would have to revise its standard service agreement forms as quickly as possible. After some initial fencing, RSC submitted a new form acceptable to the BLM in mid-March 1978, and by June 1978 RSC had ceased submitting lease applications based on its old forms. See JA 41, 67-68, 71
 
 
 [8]
 The following table shows the names of appellants, when they signed a service agreement with RSC, and when their applications were drawn in drawings conducted by the New Mexico office:
 Name Agreement Signed Drawing
--------------- ----------------- -----------------
Frederick Lowey December 13, 1977 February 7, 1978
John Gallagher January 16, 1976 April 10, 1978
J.E. Ham January 4, 1978 February 7, 1978
Heinz & Ursula
 Lichtenstein December 6, 1977 January 10, 1978
James Ross November 16, 1977 December 12, 1977
Richard Vitek July 15, 1977 December 12, 1977
 
 
 [9]
 The various decisions are practically identical, each stating simply that RSC's service agreement created an interest in Fred Engle that was not disclosed on the application, in violation of the sole party in interest regulation, and that RSC had filed many applications in which Engle had a similar interest, in violation of the multiple filing regulation. See Appellees' Supplement to Appendix at 126-143. In addition, the Gallagher and Vitek rulings stated that copies of Engle's "Amendment and Disclaimer" had been filed on February 3, 1978, but that a defect in an application existing at the time of a drawing could not be cured by submission of further information. Id. at 133, 142. No mention was made of the fact that RSC had filed the disclaimer with the New Mexico BLM office long before the drawings
 
 
 [10]
 In Lowey the IBLA relied on and explained further its decision in the first set of appeals that had been taken from the Wyoming BLM office's rejection of protests filed against RSC clients who won drawings in Wyoming, Alfred L. Easterday, 34 IBLA 195 (March 22, 1978). Easterday was the IBLA's first opportunity to consider whether RSC's "Amendment and Disclaimer" cured the defect that Doe and Schreter had identified in applications prepared by RSC, see note 4 supra. The IBLA held that "Engle's waiver was without effect as a matter of law. The original service agreement remained in effect as of the date of the drawing," thus giving RSC an interest in the applications. 34 IBLA at 200. The IBLA's decision to disregard the "Amendment and Disclaimer" was explicitly based on common law contract principles rather than an interpretation of the applicable Interior Department regulations. The RSC client whose application was at issue in Easterday sought judicial review in United States District Court in Wyoming. After a remand to the IBLA occasioned by the loss of part of the administrative record, the District Court eventually affirmed the IBLA's decision. That case is currently pending on appeal before the Tenth Circuit. Coyer v. Watt, 10th Cir. No. 81-1415
 
 
 [11]
 See note 8 supra and accompanying text
 
 
 [12]
 Richard Vitek, for instance, won a December 1977 drawing in New Mexico, see note 8 supra, and a January 1978 drawing in Wyoming, see JA 70
 
 
 [13]
 See Fuller, Consideration and Form, 41 Colum.L.Rev. 799, 806-810 (1941) (principle of private autonomy)
 
 
 [14]
 At the time these cases arose, the filing fee for noncompetitive lease applications was $10 per application; now it is $25. See 43 C.F.R. § 3103.2-1(a) (1981). The filing fee is not returned to the applicant if an application is rejected as invalid. Id. § 3112.6-2
 
 
 [15]
 See, e.g., Nat'l Bank of Albany Park v. Newberg, 7 Ill.App.3d 859, 289 N.E.2d 197 (1972); Engstrom v. Farmers & Bankers Life Ins. Co., 230 Minn. 308, 41 N.W.2d 422 (1950); Massachusetts Bonding & Ins. Co. v. Orkin Exterminating Co., 416 S.W.2d 396 (Tex.1967); Texana Oil Co. v. Stephenson, 521 S.W.2d 104 (Tex.Civ.App.1975). A similar standard is used when corporations waive their constitutional rights: there must be "an intentional relinquishment or abandonment of a known right or privilege." D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 186, 92 S.Ct. 775, 782, 31 L.Ed.2d 124 (1972); see Sambo's Restaurants, Inc. v. City of Ann Arbor, 663 F.2d 686, 690-691 (6th Cir. 1981)
 
 
 [16]
 Appellees rely principally on 15 S. Williston, Contracts §§ 1822, 1826 (3d ed. W. Jaeger 1972), and cases following that source
 
 
 [17]
 None of the parties before this court cited § 89, and apparently it was not cited before the District Court or the IBLA either. This section, which first appeared as § 89D in the 1965 tentative draft of the Second Restatement, was intended in part as an exception to the rule that "moral obligations" do not furnish consideration for a binding promise. See generally 1A A. Corbin, Contracts §§ 186, 210-239 (1963 ed.) (criticizing overgenerality of pre-s 89 rule). See also Holland v. Martinson, 119 Kan. 43, 237 P. 902 (1925); Reece v. Reece, 239 Md. 649, 212 A.2d 468 (1965) (pre-s 89 cases recognizing contracts based on moral or legal obligations). For the theoretical underpinnings of § 89, see generally Fuller, supra note 13
 
 
 [18]
 See Restatement (Second) of Agency § 401, comment a, at 238 (1958) (paid agent may be liable to principal if agent does something wrongful, negligently or with knowledge)
 
 
 [19]
 Appellees also claim that the conditional form of RSC's "Amendment and Disclaimer" rendered it invalid. That contention has no merit. Exclusive sales agencies are not inherently unfair, and the Interior Department allows filing services to make such arrangements with their clients as long as the arrangements are made after the client's application has been drawn. John V. Steffans, supra note 5. There is no suggestion in the record that RSC's clients did not freely agree to the provision when they signed the original service agreement. The only problem with the provision was that it violated Interior Department regulations if executed before a drawing, and that point was not settled at the time RSC filed its "Amendment and Disclaimer." Therefore, there was nothing inherently unfair about a conditional waiver of the provision. See 1A A. Corbin, Contracts § 215, at 295 (1963 ed.); U.C.C. § 2-209(5). By the time the applications at issue in these cases were filed, however, the IBLA's Doe and Schreter opinions had settled that the exclusive sales agency provision in pre-drawing contracts created an illegal interest, and the time for seeking judicial review had expired. See notes 4, 7 supra. Accordingly, the "Amendment and Disclaimer" could no longer be regarded as conditional, since the condition precedent to its operation had already occurred