**UNITED STATES of America,**
**Appellant**

v.

**SEARS, ROEBUCK AND CO.**

**No. 84–5713.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1985.
Decided Dec. 6, 1985.

Dean S. Cooper, Atty. Dept. of Justice, Washington, D.C., for appellant. Richard K. Willard, Acting Asst. Atty. Gen., Dept. of Justice, Joseph E. diGenova, U.S. Atty., John Oliver Birch, Asst. U.S. Atty., David M. Cohen and Charles L. Schlumberger, Attys., Dept. of Justice, Washington, D.C., were on brief for appellant.

Irwin Goldbloom with whom Maureen E. Mahoney and Aileen R. Amarandos, Washington, D.C., were on brief for appellee.

Before MIKVA, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge.

We review a decision of the district court, filed August 10, 1984, 623 F.Supp. 7 (D.C.D.C.), holding the government to an undertaking made by General Counsel of the Department of Commerce to Sears, Roebuck and Co. The undertaking is set out in a November 1980 letter signed by both sides; it followed upon and is consistent with an April 1980 industry-wide settlement of a then decade-old controversy concerning antidumping duties owed to the United States by importers and manufacturers of Japanese television receivers. The purpose of the November 1980 letter was to assure that Sears would be kept in parity with other participants in the industry-wide settlement. Absent the undertaking, Sears would have been subjected to a disproportionately heavy toll.

We affirm the district court's judgment. The governing law in this case is in entire accord with common sense, good faith, and fair dealing. It leads to the conclusion that the United States is bound to honor the settlement agreement adjustment accepted in November 1980 by General Counsel acting pursuant to authority delegated by the Secretary of Commerce.

## I. BACKGROUND

The historic facts are not in dispute. We state them summarily. On November 21,

1978, Sears paid under protest $5.4 million demanded by the Department of Treasury as antidumping duties for the period 1971–73. Sears had requested an extension of the payment date, but Treasury refused to grant any postponement. The very day Sears made its payment, Treasury issued letters to all importers liable for the duty in question announcing an extension of time to pay. While Sears did not receive Treasury's extension letter until after it had paid the $5.4 million demanded of it, other importers did receive notice in time to defer payment.

In 1979, responsibility for determining the amount of antidumping duties was transferred from Treasury to the Department of Commerce. Commerce, in 1980, negotiated a $66 million overall settlement of the duties. Sears' share, covering the years 1971–1979, was set at $13.9 million. In addition, Treasury calculated a settlement figure for penalties under which Sears' share was $6.4 million. Commerce agreed to credit against the $13.9 million the $5.4 million Sears had paid under protest in 1978. Commerce also credited Sears with an amount equivalent to accrued interest on the $5.4 million running from the November 21, 1978, payment date to April 28, 1980, the date of the settlement agreement. Thus, had collections pursuant to the overall settlement proceeded forthwith, Sears would have been placed on an equal footing with the other importers who benefited from Treasury's 1978 extension notice and had made no pre-settlement payment.

At that point, however, third parties representing the interests of United States television manufacturers commenced litigation to challenge the legality of the settlement. *See Montgomery Ward Co. v. Zenith Radio Corp.,* 673 F.2d 1254 (C.C.P.A.), *cert. denied,* 459 U.S. 943, 103 S.Ct. 256, 74 L.Ed.2d 200 (1982). That litigation produced a series of interlocutory injunctions prohibiting implementation of the settlement until June 1983, when the last injunctive order in the series was dissolved.

As a result of these 1980–1983 injunctions, Sears remained singularly situated. Its $5.4 million payment had not been refunded; other importers liable for portions of the $66 million settlement had not yet made any payment. Counsel for Sears, Roderick M. Hills, and Commerce General Counsel, Homer E. Moyer, Jr., agreed that an interest credit on the $5.4 million covering the injunction period would be appropriate. Their agreement is set out in a letter from Sears' counsel (the "Hills letter"), dated November 6, 1980, and countersigned by Commerce Assistant General Counsel, Lynn J. Barden, on November 7, 1980. The Hills letter recounts that Commerce had earlier agreed to reduce the amount to be paid by Sears under the April 1980 settlement by the November 1978 payment ($5.4 million) "plus a figure equal to interest accrued on that sum through April 28, 1980." The letter then states that

[s]imilarly, if the Agreement is deemed valid, the amount to be paid the Department of Commerce under the agreement will be further reduced by the amount of interest ... which had accrued on the [1978] payment between May 9, 1980 [the date the first injunction issued] and the date the injunction is lifted.

Upon dissolution of the last of the injunctions in June 1983, Sears tendered its payment under the settlement agreement. Based on the November 1980 letter, Sears deducted $2.8 million as the injunction period (May 1980–June 1983) interest credit. The government insisted that no injunction period interest credit was in order and filed suit to recover the $2.8 million. Shortly after filing suit, the government moved for summary judgment relying on the terms of the April 1980 settlement agreement. Sears cross-moved, citing the November 1980 letter. The district court denied the government's motion and granted Sears'. That court concluded that the November 1980 letter constituted either a dispositive interpretation or a binding modification of the April 1980 settlement agreement. *United States v. Sears, Roebuck and Co.,* 623 F.Supp. 7, 10–11 (D.D.C., 1984) (*Sears*). In reaching this determination, the district

court found that General Counsel and Assistant General Counsel of the Department of Commerce had authority to bind the government to the terms of the November 1980 letter. *Sears*, at 10.

On appeal, the government renews its argument that Commerce General Counsel Moyer and Assistant General Counsel Barden had no authority to change the April 1980 settlement agreement. Only the Secretary himself, the government contends, possessed the requisite authority. In any event, the government maintains, the November 1980 letter is not an effective interpretation of the April 1980 agreement. Furthermore, the government insists, the letter could not rank as a valid modification of the settlement agreement, for the promised interest credit is unsupported by consideration.

We hold, in accord with the district court, that the Commerce officials in question had authority to bind the government to the terms of the November 1980 letter, and that the letter effectively modified the April 1980 agreement.[1] The district court ruled that Sears' forbearance from repudiating the April 1980 settlement—in view of a prolonged injunction that threatened to frustrate that agreement's purpose—benefited the government and thus should count as consideration sufficient to support the extension of Sears' interest credit through the injunction period. We accept that analysis. Furthermore, we conclude that the effectiveness of the modification at issues does not depend on the presence or absence of consideration. The Hills letter qualifies as an eminently reasonable adjustment of an executory contract, undertaken to address circumstances not fully provided for in the original agreement. The modification embodied in the letter is thus binding under the "fair and equitable" standard articulated in section 89 of the RESTATEMENT (SECOND) OF CONTRACTS (1981), a standard we have already adopted, *see Lowey v. Watt*, 684 F.2d 957, 968 (D.C.Cir. 1982), and find well suited to this case.

## II. ANALYSIS

### A. *Commerce General Counsel's Authority to Bind the Government*

■ The government urges that no official other than the Secretary of Commerce possessed authority to bind the United States to the terms of the November 1980 letter. For this position, the government relies on 19 U.S.C. § 1617, which states:[2]

> Upon a report by a customs officer, United States attorney, or any special attorney, having charge of any claim arising under the customs laws, showing the facts upon which such claim is based, the probabilities of a recovery and the terms upon which the same may be compromised, the Secretary of [Commerce] is authorized to compromise such claim, if such action shall be recommended by the General Counsel for the Department of [Commerce].

While the Secretary indeed holds authority to compromise claims for antidumping duties, the Secretary has delegated to the Department's General Counsel, *inter alia*, authority "to take any actions necessary to implement any decision by [the Secretary] on the compromise of claims ... including the signing and execution of any settlement documents and making any corrections or changes that may be necessary therein." 45 Fed.Reg. 29,623 (May 5, 1980).

As the government would have it, at least for purposes of this litigation, the cited statute and regulation permit the General Counsel merely to recommend decisions and to carry them out once they are made by the Secretary. All dispositive actions relating to a claim—every decision—

---

1. We pretermit the question whether, as the district court alternatively held, the Hills letter qualified as a binding interpretation of the April 1980 settlement agreement.

2. The reference in *19 U.S.C. § 1617* is to the Secretary of the Treasury rather than the Secretary of Commerce. However, Reorganization Plan No. 3 of 1979 transfers § 1617 authority, as it pertains to dumping duties, to the Secretary of Commerce. *See* 44 Fed.Reg. 69,273 (1979).

must bear the Secretary's own signature. Any modification of the April 1980 settlement, the government insists, qualifies as a new or further compromise, and therefore falls outside the General Counsel's authority to accomplish by his own hand. We find this reading of the statute and regulation implausible, as did the district court.

Based upon submissions in the record, the district judge rejected the government's portrait of a Secretary burdened with sole authority not only to decide on the grand design, but to sign off on each change in detail. The Secretary's central role, the district court observed, was to make the overall decision on settlement with the importers. This prime function was not delegated to others. Once that large decision was made, however, its implementation, including tuning adjustments of the kind represented by the Hills letter, became the responsibility of the Department's General Counsel. *Sears*, at 10. We agree, and consider the government's position on this issue hardly rational.

We do not overlook the reality, given the "size and complexity of government," *Blake Construction Co. v. United States*, 296 F.2d 393, 396 (D.C.Cir.1961), that myriad officials may take unauthorized action purporting to represent the sovereign, and that, as a rule, the United States is not answerable for such action. *See, e.g., Royal Indemnity Co. v. United States*, 313 U.S. 289, 61 S.Ct. 995, 85 L.Ed. 1361 (1941) (Internal Revenue Service tax collector unauthorized to abate tax liability); *Whiteside v. United States*, 93 U.S. 247, 3 Otto 247, 23 L.Ed. 882 (1876) (assistant special agent unauthorized to enter into contract binding Treasury Department). We recognize the settled law that

> anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority.... And this is so even though ... the agent himself may have been unaware of the limitations on his authority.

*Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947), *cited with approval in Schweiker v. Hansen*, 450 U.S. 785, 788, 101 S.Ct. 1468, 1470, 67 L.Ed.2d 685 (1981) (per curiam); *cf. United States v. District of Columbia*, 669 F.2d 738, 747 (D.C.Cir.1981).

Sears, however, dealt with no petty officer or middle-range functionary. General Counsel Moyer, the record reveals, was the principal actor in arranging the April 1980 settlement. *See* Joint Appendix (J.A.) 346–48, 519–26. The Secretary approved the overall settlement in the amount recommended by the General Counsel, *see id.* 525, but did not review the arrangement in fine detail. *See id.* 346–47. Moyer stated, for example, that he did not bring to the Secretary matters such as "the details of any particular calculation theory [for computing the importers' antidumping liability]." *Id.* 347. If decisions on matters of detail relating to the *overall* settlement fell within the "broad responsibility" that the Secretary delegated to the General Counsel, *id.* 346, then surely the adjustment of *individual* liability set out in the November 1980 letter should not have required the Secretary's signature. The Hills letter adjustment, as we have observed, merely kept Sears in parity with other settlement participants; it is therefore most appropriately characterized as "implementation" rather than "claim compromise."

We emphasize that the Hills letter involved no new settlement; no new antidumping duty claims were compromised by the adjustment, nor was Sears' portion of the total settlement diminished. The injunction period interest credit served precisely and only to assure that Sears would not bear a burden no other participant was required to bear. We are entirely satisfied, in sum, that the correction or change countersigned by Assistant General Counsel Barden, with the approval of General Counsel Moyer, fit within the implementation authority delegated to General Counsel by the Secretary.

## B. *Forbearance As Consideration*

■ Consideration is generally required for an agreement modifying a contract. *Nyhus v. Travel Management Corp.*, 466 F.2d 440, 445–46 (D.C.Cir.1972). The district court found consideration for the modification in this case in Sears' "forbearance to repudiate the agreement in light of the continuing injunction and the treatment of the other importers." *Sears*, at 11. We restate the district court's reasoning.

The injunction blocked implementation of the settlement and thus left Sears, once again, in a disadvantageous position in comparison to importers from whom the government had exacted no pre-settlement payment. In face of the injunction, Commerce's prior agreement to credit Sears with interest on the $5.4 million from the payment date (in November 1978) to the settlement date (in April 1980) would not suffice to accord Sears evenhanded treatment. Sears, in these circumstances, might have withdrawn from the settlement, the district court believed, and withdrawal of a principal participant might have jeopardized the entire industry-wide arrangement. Extension of the interest credit for the duration of the injunction was a fair price, the district court concluded, for Sears' adherence to the settlement.

In declaring that Sears' forbearance constituted consideration adequate to bind the government to the interest extension, the district court did not hold that Sears had a right to repudiate. Consideration was the question the court addressed, and consideration there would be, the district court apparently assumed, so long as Sears reasonably believed that the lingering injunction so changed the equal-footing-with-other-importers bargain it had made as to warrant repudiation. *See Mel Dar Corp. v. Commissioner of Internal Revenue*, 309 F.2d 525, 531 (9th Cir.1962) ("All that is necessary for consideration is a forbearance of the right to cancel based on a belief in the existence of the right."), *cert. denied*, 372 U.S. 941, 83 S.Ct. 933, 9 L.Ed.2d 967 (1963).

The government maintains that Sears simply promised to perform a pre-existing obligation, and thereby gave up nothing of any value in exchange for the injunction period interest credit. *See Murray v. Lichtman*, 339 F.2d 749 (D.C.Cir.1964). The government additionally urges, in opposition to the district court's consideration holding, that Sears never communicated a threat to repudiate. The government itself, however, while the injunction remained in force, indicated genuine concern over the prospect of repudiation by settling importers.[3] And Sears, for its part, hardly concealed from the government its grave concern over restoration of the inequality stemming from the government's earlier insistent demand for, and later retention of, Sears' $5.4 million.[4]

**3.** In the litigation brought by United States television manufacturers to enjoin the April 1980 settlement agreement, the United States expressed the fear that an extended injunction could cause the settlement to collapse, thereby creating serious problems for the government:

> If [the previously relinquished challenges to dumping assessments] are mounted, the Secretary has already determined that there is a substantial risk that the challenges will succeed. If successful, the net result will be a refund of all the dumping duties assessed. This latter result would be clearly detrimental to the interests of the appellants [United States television manufacturers challenging the settlement], especially when the alternative—implementation of the agreements—would enable the Secretary to devote his resources to the effective and efficient implementation of T.D. 71–76 [T.D. 71–76 sets out the Secretary of the Treasury's determination

that United States importers had participated in the dumping of Japanese television receivers] in the future under the new statute....

> Moreover, the injunction could cause third parties to repudiate the agreements. It may be impossible to conclude new, fair settlement agreements in the future....

> Finally, the net effect of the possible collapse of the agreements would be the diversion of substantial resources needed for the effective future enforcement of T.D. 71–76 into an effort to defend past actions.

Appellee's Motion to Dissolve Injunction Pending Appeal, *Committee to Preserve American Color Television v. Miller*, C.A. No. 79–1948, at 46 (D.C.Cir.).

**4.** The government repeatedly insists that, once it gave Sears credit for interest through April 1980, it gave Sears all Sears could conceivably demand in the way of equal treatment. *See*

Had Sears withdrawn from the settlement, the district court pointed out, the government's attention would have been diverted from opposing the injunction. Government resources, in that event, would have been consumed in an effort to avert collapse of the settlement. The government avoided a two-front controversy and thereby clearly benefited, the district court thought, when Commerce, by continuing Sears' interest credit, checked any move by Sears to repudiate. We agree that the government gained something of value by extending the interest credit so as to keep Sears in parity with other settling importers.

We need not rest our affirmance of the district court's judgment, however, on a holding that the modification was supported by consideration. Even accepting the government's argument that Sears, in November 1980, merely undertook to perform a promise already made in April of that year, we would rule for Sears on the ground that fresh consideration was not necessary to bind the government to the settlement amendment.

## C. *Effectiveness of Modification Absent Consideration*

■ In *Lowey v. Watt*, 684 F.2d 957 (D.C.Cir.1982), this court adopted the standard contained in RESTATEMENT (SECOND) OF CONTRACTS § 89 (1981):

A promise modifying a duty under a contract not fully performed on either side is binding

(a) if the modification is fair and equitable in view of circumstances not anticipated by the parties when the contract was made. . . .

That standard covers this case. First, the contract at issue was not fully performed on either side at the time of the November 1980 Hills letter. The importers had not yet paid the agreed amounts, and the government's release of its claims against

the settlement participants (with liquidation of entries to reflect that no antidumping duties are owed) was conditioned upon full payment of the principal sums. Second, the modification is unquestionably fair and equitable and it rests on circumstances neither party fathomed when the April 1980 settlement agreement was drawn and signed: an enduring injunction blocking reasonably prompt effectuation of the settlement; and the government's indecision as to the accrual of interest on unpaid principal amounts.

We note that some confusion and considerable haste attended the composition and consummation of the April 1980 agreement. As the government represented in the injunction proceedings: "[T]he agreements were negotiated and entered into over a short period of time[;] ... [they] were prepared in a standard form which in the case of Sears, Penney's, and Montgomery Ward, were only modified at the very last minute." Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Assessment of Damages, *Zenith Radio Corp. v. United States*, No. 80–500861, at 14–15 (Ct. Int'l Trade) (*Zenith Radio*).

The government makes much of the fact that the April 1980 agreement does contain a provision adverting to the prospect of an injunction, a provision that makes no allowance for an injunction period interest credit for Sears. Thus, the government urges, the injunction was an anticipated circumstance when the contract was made; Sears assumed any risk an injunction might entail; and section 89 of the RESTATEMENT, by its very black letter, is inapplicable. Reply Brief of Appellant at 14–15; *see also* Brief for the Appellant at 18–19.

We set out the provision of the April 1980 agreement (paragraph 7) underscored by the government:

---

Reply Brief of Appellant at 15. If Sears fell out of step with other importers, the government maintains, the third parties who obtained the injunction were the cause. *See* Brief for the Appellant at 18 n. 5; Reply Brief of Appellant at

19. This rationalization will not do. The impact of the injunction fell adversely and unevenly on Sears only because the government had extracted from Sears a prepayment it did not extract from other, similarly liable, importers.

To the extent that this Agreement is the subject of litigation contesting its validity during the pendency of which liquidation of entries which are subject to this Agreement are enjoined, the time limits for payments ... will be tolled, with continued accumulation of interest on any unpaid balance, pending a final judicial decision.

As the government is obliged to concede, the provision is "inarticulate[ ]." Reply Brief of Appellant at 8. Indeed, the government itself read the paragraph in two ways. Treasury maintained that the provision tolled during the pendency of the injunction only the time limits for payments, not the accumulation of interest on unpaid settlement amounts. Commerce, on the other hand, thought the paragraph could be read to mean that the government would not charge the settling importers with interest on unpaid principal for the duration of any injunction. On Treasury's reading, Sears would be entitled to no injunction period interest credit, but neither would Sears have occasion to complain of unequal treatment. The parity relationship among importers would have been maintained. All would end up paying a total amount equal to the principal sum together with interest running from the date of the settlement. Commerce's view, however, necessitated a continuing interest credit to Sears during the injunction so that Sears would not be taxed at a higher rate than the others.

Given the disagreement between Treasury and Commerce on what the paragraph now featured by the government meant, the hurried manner in which the entire settlement agreement was patched together in April 1980, and the endurance of the injunction, Sears surely had "an objectively demonstrable reason for seeking a modifi-

cation" in the fall of 1980. *See* RESTATEMENT (SECOND) OF CONTRACTS § 89, comment b (1981). Similarly, we think it a fair conclusion that Sears did not anticipate either the length of the injunction or the attendant government uncertainty over both the meaning of the tolling provision of the agreement, and a core principle of the settlement's implementation: evenhanded treatment of the settling importers. Sears had reason not to anticipate such uncertainty, for it had advised Commerce that it would be unwilling to settle without provision for the fact that Sears alone among the importers had been pressed into making, pre-settlement, a very large principal payment.[5]

We observed in *Lowey* that the RESTATEMENT standard is meant to "distinguish situations in which the parties to an existing contract attempt to cope with unforeseen difficulties, the risk of which was not allocated in the original agreement," from "situations in which one party 'holds up' the other for increased compensation." 684 F.2d at 969. The facts of this case indicate no effort by Sears to extract an unwarranted concession from an unwilling party. Instead, this picture emerges. The parties' desire to reach and announce a settlement prompted them to act with such dispatch that all contingencies were not addressed in the original agreement. When events forced recognition of a defect in that settlement, the parties moved swiftly to clarify their bargain so that the agreement would continue to fulfill its underlying purpose. Under the circumstances presented, the contract modification did not require new consideration, for it qualifies as a fair and equitable adjustment made in the course of an ongoing transaction. *See* RESTATEMENT

---

5. On brief, the government chided Sears for "neglect[ing] to point out that there were other importers in Sears' position—importers which had made payments either in 1978, or immediately after settling in 1980, before the injunctions were issued. None of those importers received injunction period interest credits." Reply Brief of Appellant at 15. This assertion proved irresponsible. At oral argument the court specifically inquired about the alleged others in Sears' position. The government conceded that all but two of the other settling importers had made no payment at all prior to termination of the injunction in 1983 and that those who did pay something had paid only slight amounts in comparison to Sears' $5.4 million.

(SECOND) OF CONTRACTS § 89, comments a, b (1981).

CONCLUSION

Throughout this controversy over anti-dumping duties, Sears has been beset by a series of imperious and inconsistent government actions. The Customs Service originally calculated duties according to a controversial formula which the government later acknowledged to be indefensible; Sears was nonetheless pressed to pay $5.4 million under threat of revocation of import privileges. The government insisted that no postponements would be granted to any importers; postponements were in fact subsequently granted to all, but Sears was notified too late to benefit. The original settlement sought to place Sears on an equal footing with other importers, and the Hills letter was consistent with that purpose; the government now seeks to repudiate the terms of that November 1980 letter. "Rules of common sense, good faith and fair dealings," *see* Defendant's Reply to Plaintiff's Memorandum in Opposition to Defendant's Motion for Assessment of Damages, *Zenith Radio*, at 27, marked the government's course when it refrained from charging the importers with injunction period interest on the principal amounts that remained unpaid for over three years following the April 1980 settlement. Those same rules no doubt animated initial acceptance of Sears' interest credit amendment. Then the government reneged.

Justice Holmes observed over a half century ago that citizens "must turn square corners when they deal with the Government." *Rock Island, Arkansas, & Louisiana R.R. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920). In return, citizens may reasonably expect that their government will refrain from running circles around them. The government here twice permitted an equitable solution to a problem it helped create by demanding that Sears pay up ahead of others who had no better claim than Sears to delay payment. The attempt made in this litigation to impose upon Sears a toll not exacted from similarly situated importers exemplifies arbitrary conduct not "worthy of our great government." *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir.1970).

The decision of the district court that Sears is not liable for the $2.8 million the government claims Sears owes is

*Affirmed.*